# EXHIBIT B



Not Reported in A.2d                                                                    Page 1

Not Reported in A.2d, 2004 WL 1878784
**(Cite as: Not Reported in A.2d)**

**H**
Not Reported in A.2d, 2004 WL 1878784
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
ALL PRO MAIDS, INC. Plaintiff,
v.
Susan LAYTON, as an individual and Mama's
Maids, LLC, a Delaware Limited Liability
Company Defendants.
**No. Civ.A. 058-N.**

Submitted April 15, 2004.
Decided Aug. 9, 2004.
Revised Aug. 10, 2004.

Chase T. Brockstedt , of Murphy, Spadaro, &
Landon, Wilmington, Delaware, for Plaintiff.
David R. Hackett , of Griffin & Hackett, P.A.,
Georgetown, Delaware, for Defendants.

MEMORANDUM OPINION

PARSONS, Vice Chancellor.
*1 All Pro Maids, Inc. ("APM") brought this action
against Susan Layton ("Layton"), a former
employee of APM, and Mama's Maids, LLC ("MM"
), a company formed by Layton and another former
APM employee. APM alleges breach of contract
and tortious interference with contract and
prospective business relations. APM seeks damages
and injunctive relief, including specific performance
of a covenant not to compete. This matter was tried
on March 1, 2004. The parties completed post-trial
briefing on April 15, 2004. This Memorandum
Opinion reflects the Court's post-trial findings of
fact and conclusions of law.

In this opinion, the Court concludes that the
Agreement is valid and enforceable and was
breached by Layton, that Layton and MM tortiously
interfered with APM's contracts and prospective

business relations, that Layton and MM are jointly
and severally liable for damages in the amount of
$51,433, but no injunctive relief is appropriate, and
that Layton is liable to APM for its reasonable
attorneys' fees and expenses in pursuing
enforcement of its rights under the Agreement.

I. FACTUAL BACKGROUND

APM is a Delaware corporation with its principal
place of business in Lewes, Delaware. James and
Michele Sprinkle founded APM, which provides
cleaning services for commercial and residential
properties. The Sprinkles spent five to seven years "
knocking on doors" to acquire clients and establish
their business. FN1

FN1. Trial transcript ("Tr.") at 136.

In October 1997, APM hired Layton as office
manager. Her duties included hiring, supervising,
and firing cleaning staff, preparing contracts for
new customers, scheduling services for customers,
handling customer complaints, and billing. Layton
had the primary responsibility for interacting with
clients to ensure that APM met their cleaning needs.

On October 22, 1997, Layton signed a written
document entitled "Employment Agreement" (the "
Agreement") with APM. FN2 The Agreement
contains a covenant not to compete. The provisions
relating to that covenant are as follows:

FN2. PTX 3.

1. An employee who decides to terminate service
with the company must give seven (7) days notice.
2. During the time of your employment with All
Pro Maids, Inc., you shall not, in the home or
commercial cleaning field, directly or indirectly
solicit business from, contract with, or take

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 2

Not Reported in A.2d, 2004 WL 1878784
**(Cite as: Not Reported in A.2d)**

employment with any customer or former customer of the ALL PRO MAIDS, INC. or any other cleaning company or individual where you have

A. Worked physically upon a customer's premises;
B. Acted in a supervisory capacity for the ALL PRO MAIDS, INC.;
C. Acted as a salesperson for the ALL PRO MAIDS, INC.;

3. Employee agrees that, in the event this Agreement terminates, regardless of the reason for the termination or the party terminating the Agreement, Employee will not, directly or indirectly, either as an individual or as a partner or joint venturer or as an employee or agent of any person, or as an officer, director, or as a shareholder or otherwise, for a period of one (1) year from the termination of the Agreement in the home or commercial cleaning field *work, solicit, contract or take employment for any current or former customer of* the ALL PRO MAIDS where Employee was engaged as described in the paragraph 2(a), (b), and (c) or in the territories covered by the following zip codes: [21 zip codes all in Sussex County, DE].

**\*2** 4. In the event or [sic: of] a breach or threat of breach by an Employee of the terms of this Agreement, the parties agree that ALL PRO MAIDS remedy at law will be inadequate and that ALL PRO MAIDS will be entitled, in addition to any other remedies available by law, to appropriate injunctive and other equitable relief in order to get a Court Order to stop the Employee from violating the Agreement. Employee will be responsible for all court costs and attorney's fees necessary to enforce this Agreement. FN3

FN3. *Id.*

APM's policy is that all employees-including cleaners, supervisors and managers-must sign this Agreement.

In the spring of 2003, Layton's relationship with APM soured and she decided to resign. Before Layton resigned, Rebecca Truitt ("Truitt"), another employee of APM, approached her about starting a

cleaning business. Layton told Truitt that she had signed a covenant not to compete with APM, and therefore might be unable to join the new business. Layton testified that she then asked her attorney, Larry Fifer ("Fifer"), to review the Agreement and that he advised her orally that it was unenforceable. FN4 On May 16, 2003, Layton submitted a letter of resignation to APM, stating an intention to leave on May 30, 2003. Upon receiving the letter, James Sprinkle asked Layton to leave APM's employ immediately.

FN4. Tr. at 40-41. Layton did not pay Fifer anything for his advice.

On May 22, 2003, Layton and Truitt filed a Certificate of Formation with the State of Delaware for Mama's Maids, LLC, a commercial cleaning service. On May 29, 2003, MM cleaned for Quality Roofing, which up to that time had been a client of APM. By the fall of 2003, MM was servicing eleven of APM's clients, having a total of over twenty locations.

During the summer of 2003, APM became aware that it was losing clients to MM. In September 2003, after Delaware National Bank, one of APM's largest clients, switched to MM, APM began contacting attorneys to pursue the possibility of legal action against Layton and MM (collectively " Defendants"). APM filed this action on November 12, 2003. FN5

FN5. Additional facts relevant to specific issues presented at trial are discussed below in connection with the analysis of those issues.

II. PROCEDURAL HISTORY

APM's Complaint alleged breach of the Agreement, tortious interference with contractual relations and prospective business relations, and violations of Delaware's Deceptive Trade Practices Act and Trade Secrets Act. APM sought equitable and injunctive relief, damages, attorney's fees and costs. The requested relief included a temporary

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                              Page 3

Not Reported in A.2d, 2004 WL 1878784
**(Cite as: Not Reported in A.2d)**

restraining order and preliminary injunction to enjoin Defendants' breach of the Agreement and tortious interference.

The Court denied APM's request for a TRO on November 19, 2003, and entered an Order for expedited proceedings.

On January 9, 2004, Defendants answered the Complaint and also moved to dismiss. In support of its motion, Defendants argued that the Agreement is not valid or enforceable because it lacked consideration and mutual assent, and that APM failed to plead sufficient facts to support its claims for tortious interference and violations of the Deceptive Trade Practices and Trade Secrets Acts. Defendants also asserted that APM failed to state a claim against MM, because there was no privity of contract between APM and MM, and that APM's claim for equitable relief is barred by the doctrine of laches.

*3 APM responded to the motion to dismiss on February 19, 2004. As part of that response, APM withdrew its request for a preliminary injunction and its deceptive trade practices and trade secrets claims. The Court later declined to dismiss the remaining claims and conducted a trial on the merits on March 1, 2004.

The issues presented at trial included: whether the Agreement is valid and enforceable; whether MM is an appropriate defendant; whether Defendants should be enjoined from further breach of the Agreement and from tortious interference with existing or prospective contracts; and whether damages and other remedies are appropriate.

### III. ARGUMENTS AND ANALYSIS

#### A. Breach of Contract

The most prominent issue in this case is the validity and enforceability of the covenant not to compete. The Court must first determine whether APM had an enforceable contract with Layton and, if so, whether it was breached. If the Agreement is valid

and breached, the Court must determine whether specific performance or some other remedy is appropriate under the circumstances. FN6

> FN6. "Where a restriction on the ability to be gainfully employed is involved, the customary sensitivity of a court of equity to the particular interests affected by its remedies is heightened." *McCann Surveyors, Inc. v. Evans,* 611 A.2d 1, 3 (Del. Ch.1987).

#### 1. Validity

The Agreement between Layton and APM satisfies the requirements of a valid contract. Those requirements are mutual assent and consideration. FN7 APM offered Layton employment and contemporaneously presented to her the Agreement, which included a covenant not to compete. Layton and APM executed the Agreement in consideration of her employment and continued employment, thereby forming a valid contract. Because many of Defendants' arguments center on the validity of the Agreement, the Court addresses these elements in more detail below.

> FN7. *See Research & Trading Corp. v. Pfuhl,* 1992 Del. Ch. LEXIS 234, at *16 (Nov. 19, 1992) ; *Delaware Express Shuttle, Inc. v. Older,* 2002 Del. Ch. LEXIS 124, at *40 (Oct. 23, 2002).

Layton testified that she was given an employment application and other materials to sign at the same time as the Agreement. James Sprinkle explained the Agreement to her, and told her that she would not be employed if she refused to sign it. Both Layton and Sprinkle signed the document, signifying their mutual assent. FN8 Layton testified that she understood the document to mean that people could not go out and start a business, and that she agreed to it by signing it. FN9 That is, Layton promised to abide by specific terms of the Agreement that effectively prevented her from conducting business with APM's clients in competition with APM for one year in a specifically

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2004 WL 1878784
**(Cite as: Not Reported in A.2d)**

delineated geographic area.

> FN8. *See Faw, Casson & Co. v. Cranston,*
> 375 A.2d 463, 466 (Del. Ch.1977) ("
> [D]efendant's act of signing the letter
> provided written confirmation of his
> agreement not to compete ...").

> FN9. Tr. at 25.

In consideration for her promise, APM employed Layton. Because Layton did not have a contract for a specified term, she was an "at-will employee." APM employed Layton for almost six years after she signed the Agreement. In Delaware, employment or continued employment may serve as consideration for an at-will employee's agreement to a restrictive covenant. FN10 The Agreement therefore is supported by consideration and meets the requirements of a valid contract.

> FN10. *Research & Trading Corp. v. Powell,* 468 A.2d 1301, 1305 (Del. Ch.1983) ("[O]ur courts have held that continued employment of an employee whose position is terminable at will constitutes sufficient consideration to support an enforceable contract."); *see also Pfuhl,* 1992 Del. Ch. LEXIS 234, at *23 (retention of an employee at will, in exchange for a covenant not to compete, constitutes adequate consideration).

Defendants make a tortured argument that the Statute of Frauds precludes enforcement of the noncompete agreement against Layton. The Statute of Frauds requires certain contracts to be evidenced by a writing. FN11 Assuming that the Statute of Frauds applies to the Agreement, it is satisfied. The *written* Agreement contains the terms that APM seeks to enforce in this action. Defendants have failed to present any persuasive authority or argument for their novel contention that the Statute of Frauds should bar the *written* terms of the Agreement simply because other terms of the employment arrangement with Layton were not memorialized in a writing.

FN11. 6 *Del. C.* § 2714.

*4 Defendants argue that Layton and APM entered into an *oral* employment contract, but that APM is trying to enforce a different contract. That contract includes the covenant not to compete and is embodied in the Agreement, which bears the title " Employment Agreement." According to Defendants, the Agreement by its terms cannot be performed within the space of one year after it was made. They therefore contend that the employment arrangement of which the covenant not to compete in the Agreement is only a part must be reduced to writing to satisfy the Statute of Frauds. FN12 Defendants further argue that the Agreement fails to satisfy the writing requirement, because it omits terms of the oral employment contract, such as salary. Hence, they contend the Agreement is not enforceable under the Statute of Frauds.

> FN12. The Statute of Frauds, 6 *Del. C.* § 2714(a), provides in relevant part:
> No action shall be brought to charge any person ... upon any agreement that is not to be performed within the space of one year from the making thereof, ... unless the contract is reduced to writing, or some memorandum, or notes thereof, are signed by the party to be charged therewith....
> Contrary to Defendants' position, Plaintiff argues that the Employment Agreement can be performed within one year. Plaintiff's Post-Trial Reply Brief ("PRB"); the parties' post-trial opening and reply briefs are designated herein as POB, DOB, PRB and DRB, respectively) at 6. Having concluded that the Statute of Frauds defense lacks merit on other grounds, the Court need not address this issue.

Interestingly, Defendants elsewhere concede, as they must, that "at will" employment contracts do not need to be in writing. FN13 If one were to accept Defendants' argument, however, no employer could enter into a written covenant not to compete having a duration of one year or more with an at-will employee without reducing to writing all the other terms of their employment arrangement. There

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                          Page 5

Not Reported in A.2d, 2004 WL 1878784
(Cite as: Not Reported in A.2d)

could not be a separate agreement that focused primarily on the covenant not to compete. The Court is not aware of any authority that requires such a result. FN14

> FN13. DOB at 13.
>
> FN14. Defendants' reliance on *Enloe v. Gorkin*, 1990 WL 263563 (Del.Super.Dec. 26, 1990), is misplaced. In *Enloe*, the plaintiff tried to enforce a doctor's note regarding a patient's condition as a contract. The court ruled the writing was a note, not a contract. *Id.* at *2. In contrast, this Court has held that the writing at issue here is a valid contract.

Defendants' sole basis for invoking the Statute of Frauds is the duration of the covenant not to compete. That covenant, however, is memorialized in the *written* Agreement, and it includes all the material terms of the covenant. As demonstrated above, the parties assented to the Agreement and it is supported by consideration. Thus, the Court rejects Defendants' Statute of Frauds defense.

In another tortured argument, Defendants contend that the parole evidence rule bars APM from relying upon extrinsic evidence of what Defendants characterize as the missing terms of mutual assent and consideration in an effort to supplement the written Agreement and thereby satisfy the Statute of Frauds and other requirements for a valid contract. Since the Court has concluded that the Agreement is supported by mutual assent and consideration and that it complies with the Statute of Frauds, there is no merit to Defendants' parole evidence argument. As explained in *Taylor v. Jones:*

> The Parole Evidence Rule is a principle of substantive law that prevents the use of extrinsic evidence of an oral agreement to vary a fully integrated agreement that the parties have reduced to writing. FN15

> FN15. 2002 Del. Ch. LEXIS 152, at *10-11 (Dec. 17, 2002).

Contrary to Defendants' argument, the parole evidence rule provides no basis to bar the introduction of the *written* Agreement. Instead, it bars extrinsic evidence of oral agreements to vary fully integrated agreements that are reduced to writing. FN16 The Rule does not preclude the use of extrinsic evidence of the elements necessary to form a contract that does not contradict the writing itself, such as the consideration reflected in APM's continued employment of Layton. FN17

> FN16. *Id.*
>
> FN17. *See Equitable Trust Co. v. Gallagher*, 102 A.2d 538 (Del.1954) ; *Benz v. Wilmington Trust Co.*, 333 A.2d 169 (Del.1975).

*5 The Agreement between APM and Layton is valid as a matter of contract law. Defendants' arguments to the contrary are wholly without merit.

### 2. Breach

Layton in concert with MM acquired eleven of APM's clients within four months of her resignation. Defendants have admitted that the Agreement was breached if it was valid. FN18 Layton is therefore individually liable to APM for her breach of the Agreement. FN19

> FN18. DOB at 22.
>
> FN19. MM was not in privity of contract with APM. Nor has APM asserted any claim against MM or Truitt for breach of contract or for contributing to Layton's breach of her contract with APM. MM is accused, however, of tortious interference with APM's client contracts and prospective business relations, discussed *infra.*

### 3. Enforceability

To be enforceable, a covenant not to compete must

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 6

Not Reported in A.2d, 2004 WL 1878784
**(Cite as: Not Reported in A.2d)**

(1) meet general contract law requirements, (2) be reasonable in scope and duration, both geographically and temporally, (3) advance a legitimate economic interest of the party enforcing the covenant, and (4) survive a balance of the equities. FN20 When seeking specific performance of a covenant not to compete, the plaintiff has the burden of establishing her case by clear and convincing evidence . FN21

> FN20. *Delaware Express Shuttle,* 2002 Del. Ch. LEXIS 124, at *40.

> FN21. *Tristate Courier & Carriage, Inc. v. Berryman,* 2004 Del. Ch. LEXIS 43, at *35 (Apr. 15, 2004).

As noted above, the Agreement meets general contract law requirements.

The restrictive covenant in the Agreement is limited to one year and an area defined by specific zip codes where the majority of APM's clients are located. FN22 Defendants conceded that if the covenant not to compete is valid, it is reasonable as to time and geography. FN23

> FN22. PTX 3. The language of the Agreement (¶ 3) arguably could be construed in the disjunctive to prohibit Layton, in the home or commercial cleaning field, from working, soliciting, contracting or taking employment (1) for any current or former customer of APM with which she had had contact on behalf of APM *or* (2) in the territories covered by 21 specified zip codes in Sussex County. Both sides, however, have construed the prohibition in the conjunctive to apply only to entities that were current or former customers of APM *and* located in the defined territory. Accordingly, the Court has adopted that construction for purposes of this opinion.

> FN23. DRB at 6. Noncompete agreements covering limited areas for two or fewer

years generally have been held to be reasonable. *See Delaware Express Shuttle,* 2002 Del. Ch. LEXIS 124, at *54 (finding three years unreasonable because of rapid customer turnover, and reducing duration of covenant to two years); *COPI of Delaware, Inc. v. Kelly,* 1996 Del. Ch. LEXIS 136, at *12 (Oct. 25, 1996) (two year restriction reasonable for company officers and sales personnel); *Pfuhl,* 1992 Del. Ch. LEXIS 234, at *31 (one year restriction reasonable for company's vice president).

Courts recognize protection of an employer's goodwill as a legitimate economic interest for a restrictive covenant. FN24 "[A]n employer has an interest in the goodwill created by its sales representatives and other employees, which is vulnerable to misappropriation if the employer's former employees are allowed to solicit its customers shortly after changing jobs." FN25 This is particularly true where, as here, the evidence demonstrates the importance of personal contacts to the success of a company. FN26

> FN24. *Rhis, Inc. v. Boyce,* 2001 Del. Ch. LEXIS 118, at * 20 (Sept. 26, 2001).

> FN25. *Pfuhl,* 1992 WL 345465 234, at *12; *Tristate,* C.A. No. 20574, mem. op. at 28-29.

> FN26. *Tristate,* C.A. No. 20574, mem. op. at 29.

As office manager, Layton had the opportunity to develop economically valuable relationships with APM's customers. James Sprinkle testified that Layton held the most important position at APM and was its most important person. FN27 She hired and supervised all of the cleaners and their supervisors, bid on prospective clients, prepared contracts for new clients, scheduled cleaning services for clients, and handled complaints. Layton testified that she ran the business. FN28 As a result, Layton knew all the clients, what services they needed and how much they paid for the services.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                              Page 7

Not Reported in A.2d, 2004 WL 1878784
**(Cite as: Not Reported in A.2d)**

She easily could put this knowledge and experience to her own use and to the detriment of APM. The Agreement serves a legitimate purpose in protecting APM's goodwill, confidentiality, and established contracts. FN29

> FN27. Tr. at 151.

> FN28. *Id.* at 27.

> FN29. Defendants concede that, "The Restrictive Covenant is designed to protect a legitimate business interest of APM." DRB at 6.

The balance of the equities favors specific enforcement of the Agreement. On the one hand, APM required Layton to sign a covenant not to compete as a condition of employment. Sprinkle explained the Agreement to Layton and she understood it. The Agreement served to protect APM's valuable business relationships with its customers-relationships that would be vulnerable to misappropriation by an employee in Layton's position. Failing to enforce the Agreement would deprive APM of the benefit of its bargain. On the other hand, specific enforcement of the Agreement would preclude Layton from soliciting APM's customers for a reasonable period of time and in a limited area. Layton has been and is free to pursue clients that were not associated with APM before she left. Upon expiration of the Agreement and any injunction imposed by this Court, Layton would be free to pursue any clients she wishes. With Layton having enjoyed the benefits of almost six years of employment with APM, the Court fails to see any undue hardship to Layton from enforcement of the Agreement.

**\*6** The Court further finds that the Agreement is enforceable in equity. The noncompetition clause, however, expired by its own terms on May 16, 2004, one year after Layton left APM. The consequences of that expiration are discussed under "Remedies," *infra.*

4. Prior Material Breach

Defendants contend for the first time in their post-trial brief that even if the Agreement is valid, APM cannot enforce it because APM committed a prior material breach. FN30 According to Defendants, APM breached the Agreement by asking Layton to leave APM on the day she submitted her resignation without providing her with seven days notice or paying her for those days. Notwithstanding the belated assertion of this defense, the Court will address Defendants' arguments.

> FN30. DOB at 27-29.

Defendants failed to identify the source of this purported obligation to provide an at-will employee with notice or compensation for the notice period. The Court can only speculate that it stems from the Agreement. FN31 Yet, nothing in the Agreement required APM to pay Layton after she submitted her resignation. The Agreement states that the *employee* must give seven days notice before leaving. It does *not* impose any obligations on the employer once the employee resigns or gives notice. FN32 Defendants also failed to present any evidence of an oral contract requiring notice to Layton. An employer may terminate an at-will employee, like Layton, at any time, subject to the implied covenant of good faith and fair dealing. FN33

> FN31. *See* DOB at 27, citing *Dickinson Medical Group v. Foote,* 1989 Del.Super. LEXIS 156 (Mar. 23, 1989)(holding that medical group's failure to compensate a physician for services as delineated in her contract was a material breach, which excused her continued performance, where doctor had an employment contract for a defined term). Unlike the doctor in *Dickinson,* Layton was an at-will employee.

> FN32. *See* PTX 3. Moreover, Layton presented no evidence that she ever requested payment for those days.

> FN33. *Merrill v. Crothall-American, Inc.,* 606 A.2d 96, 103 (Del.1992) (Employer

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                        Page 8

Not Reported in A.2d, 2004 WL 1878784
**(Cite as: Not Reported in A.2d)**

has "freedom to terminate an at-will employment contract for its own legitimate business, or even highly subjective, reasons."); *see also E.I. du Pont de Nemours & Co. v. Pressman*, 679 A.2d 436, 437 (Del.1996) (Employment-at-will doctrine "generally permits the dismissal of employees without cause and regardless of motive.").

Not surprisingly, Defendants argue that by asking Layton to leave APM on the day she submitted her resignation, rather than the later date Layton unilaterally offered, APM violated the implied covenant of good faith and fair dealing. Such an implied covenant accompanies every employment contract. FN34 Defendants presented no evidence, however, that even suggests that APM hired Layton or terminated her employment in bad faith. In fact, Layton voluntarily chose to resign even after Sprinkle assured her that her job was not in danger. APM acted within its rights in asking Layton, an at-will employee, to leave the same day she submitted her resignation. FN35

> FN34. *Cornely v. Hartco, Inc.,* 1994 Del. Ch. LEXIS 5, at *6 (Jan. 27, 1994) ("An implied covenant of good faith and fair dealing is included in every employment contract made under the laws of Delaware." ).

> FN35. Even if APM's failure to pay Layton for seven days after her resignation did constitute a breach, it would not be sufficiently material to render the entire Agreement unenforceable. *See McCann,* 611 A.2d at 3 ("a *material* breach of the other party excuses performance") (emphasis added).

The Court therefore finds that APM did not commit a prior material breach that would preclude enforcement of its Agreement with Layton.

### B. Tortious Interference with Existing and Prospective Business Relations

APM asserts that Defendants tortiously interfered with its existing contracts and prospective business relations. The torts of interference with contracts and interference with prospective business relationships are closely related. FN36 For each of the torts, APM must prove respectively: (1) the existence of either a valid contract or reasonable probability of a business expectancy; (2) the interferer's knowledge of the contract or expectancy; (3) intentional interference that induces or causes a breach or a termination of the business expectancy; and (4) damages. FN37 In addition, for interference with business expectancies, the Court must also consider Defendants' right to interfere with APM's expectancies within the limits of fair competition. FN38 APM must prove the elements of these torts by a preponderance of the evidence . FN39

> FN36. *Delaware Express Shuttle,* 2002 Del. Ch. LEXIS 124, at *88.

> FN37. *Id.; see also DeBonaventura v. Nationwide Mutual Ins. Co.,* 419 A.2d 942, 947 (Del. Ch.1980). In some cases, the court has also noted that defendants interference must be without justification. *Irwin Lieghton, Inc. v. W.M. Andersen Co.,* 532 A.2d 982, 992 (Del. Ch.1987) ; *CPM Indus., Inc. v. Fayda Chems. & Minerals, Inc.,* 1997 Del. Ch. LEXIS 175, at *23-24 (Nov. 26, 1997). Defendants failed to demonstrate a valid justification for their actions in this case.

> FN38. *Id.; see also DeBonaventura,* 419 A.2d at 947.

> FN39. *See Pfuhl,* 1992 Del. Ch. LEXIS 234, at *38.

*7 APM had valid contracts or business relationships with at least eleven of MM's clients. FN40 Those clients had been long-term customers of APM, and APM reasonably expected to continue servicing them.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 9

Not Reported in A.2d, 2004 WL 1878784
(Cite as: Not Reported in A.2d)

> FN40. In its opening brief, APM argued that twelve of MM's fourteen commercial clients were former APM clients. POB at 7. The twelfth client is Tanger Outlets (formerly known as Rehoboth Outlets), which MM began working for after January 1, 2004. Rehoboth Outlets had been a client of APM at one point, but was using another cleaning service when it switched to MM. Since APM did not seriously pursue any claims for relief as to Tanger Outlets at trial or in its post-trial briefing and the evidence regarding it is incomplete, the Court has not considered Tanger Outlets for purposes of this opinion.

Layton testified that she knew about all the APM contracts entered into during her employment. FN41

> FN41. Tr. at 27-28.

Defendants began servicing APM clients shortly after Layton left APM, notwithstanding their knowledge of the Agreement. By the time of trial (March 1, 2004), eleven former APM clients had hired MM to perform cleaning services for them. Contracting with these clients and servicing them constitute intentional acts of Layton and MM. Under the circumstances of this case, those acts are sufficient to support a claim of tortious interference. Based on the evidence presented at trial, the Court finds that Layton or Truitt (or persons acting on MM's behalf) had contacts with each of these eleven clients that facilitated their switch from APM to MM.

APM identified five clients who breached their contracts with APM by failing to give thirty days notice before terminating APM's services. They are: Quality Roofing, Thorogoods, Century 21, Sussex Eye Center, and Ferguson. Each of these clients left APM and became a client of MM. Layton herself testified that, at least, Quality Roofing, Thorogoods, and Century 21, had contracts with APM that included thirty-day notice provisions. APM presented evidence that Sussex Eye Center and Ferguson also had contracts with APM with thirty-day notice provisions when they switched to MM. The evidence further showed that each of those five clients terminated their relationship with APM without providing the requisite notice.

APM had long term business relationships with all eleven clients and a reasonable expectancy that those relationships would continue. Layton knew about those relationships as a result of her employment at APM, and she and MM intentionally interfered with them. APM lost the profits that it otherwise would have made had Defendants not interfered.

Layton was not privileged to interfere with APM's prospective business relationships because she was prohibited from working, soliciting, contracting or taking employment for any current or former clients of APM under the Agreement. Layton's actions, even under a mistaken understanding of the enforceability of the Agreement, were at her own risk.

MM also was not privileged to compete with APM under the circumstances. MM is a distinct corporate entity from Layton. The Court recognizes that fact and that MM was not a party to the covenant not to compete with APM. Layton, however, is a principal and employee of MM. The privilege to compete is circumscribed by the limits of fair competition. FN42 MM's status as a separate business entity does not provide it with a privilege to compete beyond the limits of fair competition. MM did not have a privilege to take advantage of the information and goodwill that Layton had obtained during her employment with APM when Layton's participation in the challenged activities was both a breach of contract and tortious. Furthermore, MM would be vicariously liable for Layton's torts under the doctrine of respondeat superior. FN43

> FN42. *Delaware Express Shuttle*, 2002 Del. Ch. LEXIS 124, at *88. The other partner in MM, Rebecca Truitt, sought out Layton's participation to take advantage of her expertise and contacts as APM's office manager. Truitt also knew about Layton's covenant not to compete with APM from the time she and Layton formed MM.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                  Page 10

Not Reported in A.2d, 2004 WL 1878784
(Cite as: Not Reported in A.2d)

Therefore, the Court concludes that the conduct of MM through Truitt was not privileged.

FN43. Restatement (Second) of Agency §§ 219, 220 cmt. a (2004).

*8 The Court finds that APM proved that Defendants are liable for tortious interference with APM's contracts with each of the five clients identified above as having failed to provide thirty days notice. The Court also finds Layton and MM liable for tortious interference with APM's prospective business relations with respect to all eleven clients, because they were not privileged to compete due to Layton's Agreement with APM and MM's acquisition of those clients in contravention of Layton's obligations to APM.

C. Defenses

I. Laches

Defendants argue that APM's claim for injunctive relief is barred by the doctrine of laches. Laches will bar a claim if the claimant had actual or constructive knowledge of the claim and unreasonably delayed in bringing it, and the delay caused prejudice to the Defendants. FN44 Defendants argue that APM knew about Layton's breach of the Agreement in early June, but waited until November to file suit, and has put forth no valid reason for the delay. Defendants also claim prejudice by the delay because they incurred costs in organizing a new business, spent the time arranging to work for former APM clients, not suspecting that the restrictive covenant would be enforced, and now must bear the costs of defending this action.

FN44. *E.g., Fike v. Ruger,* 752 A.2d 112, 113 (Del.2000) ; *Kerns v. Dukes,* C.A. No.1999-S, mem. op. at 19 (Del. Ch. Apr. 2, 2004).

Defendants' arguments are not persuasive. For

laches to apply, the claimant's delay must be unreasonable. When Layton resigned, she did not advise APM that she planned to start a competing cleaning business with Truitt. Likewise, there is no evidence that APM or the Sprinkles obtained contemporaneous knowledge of that fact from any other source. In the succeeding months, James Sprinkle contacted each client who terminated and asked what cleaning services they were using. Except for Quality Roofing, no one told him that it was Defendants. FN45 Sprinkle testified that APM clients transferred to MM one-by-one over time, and APM hesitated to take on the financial burden of a lawsuit over the loss of one or two clients. Moreover, as soon as Sprinkle learned that Quality Roofing had begun using the Truitts, he had his attorney send them a warning letter. FN46 When Sprinkle realized that Defendants were causing serious financial harm to APM he began consulting with attorneys about the problem, and filed suit as soon as he found an attorney to accept the case. FN47

FN45. In June 2003, Thorogoods and Fergusons said they would do cleaning "in house," Tr. at 156, 175-76; in July 2003, Sussex Eye Center said it was using Dee's Cleaning in Georgetown, Tr. at 144; and in August 2003, Century 21 said it was using another service but did not give a name, Tr. at 181.

FN46. Tr. at 168, 187; DTX 9. Both Rebecca Truitt and her husband worked for APM until May 2003. Although he was not an owner of MM, Mr. Truitt worked with his wife in providing cleaning services to MM's clients.

FN47. Sprinkle first consulted an attorney in Georgetown in September 2003. After two or three attorneys were unable to take the case, Sprinkle contacted Mr. Brockstedt, who agreed to represent APM.

The Court finds that APM's alleged "delay" in filing suit was not unreasonable under the circumstances. Moreover, it was well within the time period

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 11

Not Reported in A.2d, 2004 WL 1878784
(Cite as: Not Reported in A.2d)

prescribed by the legal statute of limitations, which provides a presumptive time period for application of the equitable doctrine of laches. FN48

> FN48. *See, e.g., Kerns,* C.A. No.1999-S, mem. op. at 8; *U.S. Cellular Inv. Co. v. Bell Atlantic Mobile Sys., Inc.,* 677 A.2d 497, 502 (Del.1996) ; *Kahn v. Seaboard Corp.,* 625 A.2d 269, 277 (Del. Ch.1993).

Defendants incurred the costs of organization and start-up almost immediately after Layton left APM. APM's alleged delay in taking action against Defendants had no effect on those start-up costs. Defendants also determined to solicit APM clients despite the risk that the restrictive covenant might be enforced against them. Any prejudice to Defendants is a result of their own doing. APM's action is not barred by laches.

## 2. Equitable Estoppel

\*9 Defendants contend that APM is equitably estopped from enforcing the Agreement against them. The doctrine of equitable estoppel may provide a defense "when a party by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment." FN49 To establish equitable estoppel, the party claiming the estoppel must show that it: (1) lacked knowledge or the means of obtaining knowledge of the truth of the facts in question; (2) relied on the conduct of the party against whom equitable estoppel is claimed; and (3) suffered a prejudicial change of position as a result of its reliance. FN50

> FN49. *Wilson v. American Ins. Co.,* 209 A.2d 902, 903-04 (Del.1965).

> FN50. *Waggoner v. Laster,* 581 A.2d 1127, 1136 (Del.1990) ; *Delaware Express Shuttle,* 2002 Del. Ch. LEXIS 124, at \*37.

Defendants allege that APM led Layton to believe that the Agreement was unenforceable, and she

reasonably relied on APM's representations and conduct to her detriment. Specifically, Defendants assert that Sprinkle told Layton the Agreement was unenforceable and never tried to enforce comparable agreements against four other employees who were in breach. FN51

> FN51. DOB at 24-25.

Layton testified, however, that she did not rely on APM's representations, but rather on those of her own attorney in concluding that the Agreement was unenforceable. FN52 In fact, she told Truitt that she could not join her in a competing business until she had her attorney look at the Agreement. FN53 Therefore, Layton not only had, but also utilized, other means for obtaining knowledge of whether the Agreement was enforceable.

> FN52. Tr. at 228. To the extent Layton tried at trial to back away from her deposition testimony and suggest that she also relied in part on Sprinkle's statement, the Court finds her deposition more credible. At the deposition, Layton testified unequivocally that she relied on her attorney, Mr. Fifer, and not Sprinkle, in starting MM. *See* Tr. at 226-27.

> FN53. *Id.* at 207.

Moreover, both Layton and Sprinkle testified that APM *did* try to assert the Agreement against other employees. Sometime between 2000 and 2002, two of APM's cleaners cleaned a few houses in breach of the restrictive covenant. Layton testified that Sprinkle called his attorney who advised him that the covenant could not be enforced against the cleaners. While Layton was in the room during the call, she did not hear the entire conversation. Sprinkle told Layton "there was nothing that could be done," but did not tell her why. FN54 Nevertheless, Sprinkle still had his attorney send warning letters to the cleaners and they discontinued the offending activities. As to third employee, Layton could not say that Sprinkle had any knowledge of her alleged violations. Finally,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                Page 12

Not Reported in A.2d, 2004 WL 1878784
**(Cite as: Not Reported in A.2d)**

with respect to the fourth employee, all Layton could say was that Sprinkle called and "kind of harassed [her] a little bit to try to scare her, but it didn't work." FN55

> FN54. *Id.* at 225-226.

> FN55. *Id.* at 204.

Sprinkle's actions show that he thought the restrictive covenant could be used to protect APM and that he attempted to use it for that purpose. The fact that APM did not sue these other employees may mean only that the economics of those situations did not justifying incurring the expense of legal action. Layton knew that Sprinkle had tried to use the covenant to protect APM's interest. The fact that on one occasion Sprinkle told her nothing could be done is inconclusive. There are many reasons why it might not be practicable to pursue enforcement of a restrictive covenant in a particular instance. The positions of the offending parties could differ, for example. Layton was a manager, not a cleaner. While it may not have made sense to attempt to enforce a restrictive covenant against two cleaners, who were not privy to APM's business policies, the situation could be quite different with a manager like Layton. FN56 In these circumstances, the Court finds that Layton could not reasonably have relied on Sprinkle's comments or conduct as meaning that the Agreement could not be enforced against her. Consequently, APM is not equitably estopped from enforcing the Agreement against Defendants.

> FN56. *See McCann,* 611 A.2d at 4 (" [W]here valuable trade secret or other proprietary information has been learned by the defendant and, therefore, his competition with plaintiff's business may be particularly effective and unfair, the contractual provision not to compete is more likely to be specifically enforced.").

D. Remedies

1. Damages

*10 The proper measure of damages for breach of a covenant not to compete is APM's lost profits. FN57 APM contends that it should receive five years of projected lost profits because the eleven clients it lost to MM had been clients of APM for an average of five years. If Layton had not breached the Agreement, however, Defendants could have competed legitimately for that business after May 16, 2004. APM's clients could terminate their service contracts with APM at any time provided they give thirty days notice. Because the Truitts cleaned for many of those clients and Layton was their contact person, APM might have lost some or all of those clients to MM through valid competition within a relatively short time after May 16, 2004. The Court, therefore, finds that APM has not proven that it is entitled to recover five years of lost profits.

> FN57. *See Rhis,* 2001 Del. Ch. LEXIS 118, at *24 (awarding damages based on plaintiff's historical profit margin); *cf. Delaware Express Shuttle,* 2002 Del. Ch. LEXIS 124, at *60-61 (awarding plaintiff the defendants' profits instead of plaintiff's lost profits, where plaintiff did not prove its lost profits).

APM's damages should be based on a shorter time period. APM's expert, Andrew C. Verzilli ("Verzilli "), testified that, in his opinion, APM's lost profits from May 2003 through May 2004 would have been $31,000, and through May 2005 would have been $56,600. FN58 These figures take into account the normal 5% attrition rate of APM's clients. They also reflect Verzilli's conservative assumption of no growth in the annual revenues from the lost customers during the period from May 2004 to May 2005 and his discounting of the revenues for that period to present value using a discount rate of 15% to account for market and risk conditions. This two-year projection of lost profits accounts for APM's likely eventual loss of the clients in issue due to permissible competition from Defendants, but also assumes that those clients, on average, would have remained with APM through May 2005, absent Layton's breach and Defendants' tortious conduct during the term of the Agreement.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 13

Not Reported in A.2d, 2004 WL 1878784
(Cite as: Not Reported in A.2d)

FN58. PTX 38; Tr. at 99.

Defendants contend the Court should not award
damages because APM failed to prove Defendants
proximately caused any damage. Specifically,
Defendants contend that the eleven clients left
either because they wanted to continue receiving
services from the Truitts or they were dissatisfied
with APM. The Truitts had been with APM since
1992 and serviced almost all of the clients who
switched to MM.

The Court finds this argument unpersuasive. The
evidence showed that APM clients dealt with
Layton more than anyone else at APM. Sprinkle
testified that Layton "had all the knowledge, what
we charged, how often we went there, what kind of
supplies they got, the dates, the cleaning, the
contacts, the phone numbers, the cell phones. She
knew everybody." FN59 It is therefore reasonable
to infer that Layton contributed to MM's success in
obtaining APM's former clients. Defendants'
argument might well have merit if the Truitts had
started a competing cleaning business on their own,
but they chose not to do so. Instead, they joined
with Layton to form MM. The Court finds that the
evidence fully supports an award of damages
against Defendants for the eleven clients at issue.
FN60

FN59. Tr. at 159-60.

FN60. Defendants rely heavily on *Total
Care Physicians, P.A. v. O'Hara,* 2003
WL 21733023 (Del.Super. July 10, 2003).
The *Total Care* case involved claims for
misappropriation of trade secrets; APM
did not pursue any trade secrets claim at
trial. In any case, the proofs presented in
this case satisfy APM's burden on
causation, assuming it is as stated in *Total
Care.*

*11 Defendants also contend that only Layton, and
not MM, can be held liable for breach of the
Agreement, because only Layton is bound by the
Agreement. The Court agrees that MM is not bound
by the Agreement. Therefore, it is not liable for the

damages caused by Layton's breach. MM is liable,
however, for the damages caused by their tortious
interference with five of APM's contracts and with
APM's prospective business relations with the
eleven clients it lost to MM.

In addition, Defendants challenge the methods
Verzilli used to calculate damages. Specifically,
Defendants criticize Verzilli's treatment of fixed
costs, taxes and the starting point for his first year
damages. FN61 Notably, Defendants did not proffer
a damages expert of their own.

FN61. DOB at 38, 40.

Verzilli explained at trial that he did not deduct
fixed costs because APM had to pay the fixed costs
for its existing clients notwithstanding the loss of
eleven clients to MM. The amount of these costs,
therefore, was not affected by the breach and
tortious interference. The federal district court for
Delaware has held that "fixed overhead is not to be
charged against Plaintiff's damages." FN62 Based
on the evidence presented, and the absence of any
competing expert testimony from Defendants, the
Court will not charge fixed costs against Plaintiff's
damages. The Court finds that APM's expert
properly did not deduct fixed costs in calculating
lost profits.

FN62. *W.L. Gore & Assoc., Inc. v. Carlisle
Corp.,* 1978 U.S. Dist. LEXIS 17698, at *
39 (D.Del. May 17, 1978); *see also Vitex
Mfr. Corp. v. Caribtex Corp.,* 377 F.2d
795, 799 (3d Cir.1967) (holding that
overhead should not be deducted from lost
profits because overhead remained
constant and was unaffected by the
contract); *Paper Converting Machine Co.
v. Magna-Graphics Corp.,* 745 F.2d II, 23
(Fed.Cir.1984) ("Thus fixed costs ... are
excluded when determining profits.").

Defendants further challenge Verzilli's failure to
deduct taxes from his calculation of lost profits.
Verzilli admitted being uncertain whether this was a
requirement in Delaware. Awards of lost profits are

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                        Page 14

Not Reported in A.2d, 2004 WL 1878784
(Cite as: Not Reported in A.2d)

considered taxable income by the IRS and, as a result, by the State of Delaware. FN63 Deducting taxes from the lost profits calculation would result in a double tax on the award. Thus, the Court concludes that Verzilli's calculation was proper.

> FN63. *See* Internal Revenue Service Pub. 525, 2003; 30 *Del. C.* § 1105.

Finally, Defendants contest Verzilli's estimate that APM's lost profits for the first year, ending May 16, 2004, was $31,000, because he did not make any adjustment "for the fact that clients left at various times during the one-year term of the Restrictive Covenant." FN64 In another case involving an award of damages for tortious interference and breach of a restrictive covenant, this Court stated: FN65

> FN64. DOB at 39.

> FN65. *Delaware Express Shuttle,* 2002 Del. Ch. LEXIS 124, at *60, quoting *Red Sail Easter Ltd. Partners, L.P. v. Radio City Music Hall Prods., Inc.,* 1992 WL 251380, at *7 (Del. Ch. Sept. 29, 1992).

The law does not require certainty in the award of damages when a wrong has been proven and injury established. Responsible estimates that lack mathematical certainty are permissible so long as the Court has a basis to make a responsible estimate of damages. The evidence here shows that the eleven clients began using MM at various times from May 29 to September 2, 2003. Defendants argue that Verzilli improperly estimated lost profits for the first year from May 2003 to May 2004. They also argue that Verzilli should have presented his data on a client by client basis, instead of in the aggregate, as he did.

The Court finds the aggregate numbers are sufficient, but agrees with Defendants that they should be adjusted somewhat because the clients left after May. The evidence indicates that the average time after May 16, 2003, that the eleven clients switched to MM was two months.

Accordingly, the Court will reduce Verzilli's estimate of lost profits for the first year ($31,000) by one sixth or $5,167.

*12 The Court will award APM damages on its claims for breach of contract and tortious interference equal to APM's projected lost profits for the period through May 16, 2005, in the amount of $51,433 ($56,600-$5,167). Layton and MM are jointly and severally liable for that amount.

### 2. Equitable Relief

APM requested specific enforcement of the Agreement and a permanent injunction barring Defendants from interfering with APM's current and prospective customers. The Court has concluded that the Agreement is enforceable. By its own terms, however, the Agreement expired on May 16, 2004. The Agreement cannot be specifically enforced as written. Subject to the uncertainties created by this litigation, MM was privileged to compete at the expiration of the agreement. Consequently, there has been no showing that tortious interference with prospective business relations is likely to continue in the future. If that were to occur, APM could seek appropriate remedies at that time.

APM requested that the Court craft an equitable remedy enjoining Defendants from competing with APM for a year from the date of judgment. Having determined to award APM money damages that reflect the impact of the noncompetition agreement, the Court concludes that APM's request would, in effect, extend the restriction imposed by the Agreement for another year. FN66 That would not be appropriate in the circumstances of this case.

> FN66. *See Tri-State,* C.A. No. 20574-N, mem. op. at 40 n. 152 (noting that the noncompete agreement provides "the most appropriate caliper for measuring and defining an appropriate remedy .")

Moreover, the harm has already occurred. The Court cannot order the clients to return to APM. It

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 15

Not Reported in A.2d, 2004 WL 1878784
(Cite as: Not Reported in A.2d)

would be detrimental to the clients, and not particularly helpful to APM, if the Court were to enjoin MM from servicing those clients without forcing them to return to APM. FN67 Therefore, MM will be permitted to retain the eleven clients and the Court will compensate APM for the loss of those clients with an award of money damages. The remedy at law, money damages, is adequate in this action.

> FN67. In apparent recognition of these difficulties, APM does not seek to preclude Defendants from continuing to serve the eleven former APM clients in question. PRB at 17.

### 3. Fees and Costs

APM has requested costs and reasonable attorneys fees as specified by the Agreement. The Agreement provides: "[e]mployee will be responsible for all court costs and attorneys fees necessary to enforce this agreement." Former Chancellor Allen addressed such a request in the employment context. He stated:

With respect to contracts it is settled that a provision by which one party undertakes to pay counsel fees of the other in the event of his own breach is not void as against public policy. While no Delaware case has been found in which a fee shifting provision in an employment contract has been directed against an employee, cases in other jurisdictions have enforced such provisions in this way. FN68

> FN68. *Pfuhl*, 1992 WL 345465, at *14; *see also Knight v. Grinnage*, 1997 WL 633299 (Del. Ch. Oct. 7, 1997)(Steele, V.C.)

Chancellor Allen noted certain public policy concerns when the fee shifting provision is part of an employment contract because of concerns over disparities in bargaining power but found that those concerns were not implicated with respect to the business savvy parties before him.

Those public policy concerns are not implicated in this case for other reasons. APM is not a large corporation with enormous bargaining power. It is a small family owned business in Sussex County, Delaware, serving local clients. The evidence shows that Layton was a very important employee of APM. In addition, the fee shifting provision does not relate to a breach of any term of the general employment relationship, but rather to Layton's knowing and intentional conduct after resigning from APM in violation of a covenant not to compete. The Court will award APM court costs and attorneys fees against Layton in accordance with the Agreement.

*13 The record does not demonstrate the amount or the reasonableness of fees incurred by APM. Thus, the Court's holding is limited to establishing APM's right to fees and costs, taking into account that APM abandoned certain of its initial claims. Determination of the proper amount of those fees and costs must await appropriate supplementation of the record. Within ten days of the date of this Memorandum Opinion, APM's counsel shall submit an affidavit and appropriate documentation showing the amount and reasonableness of the attorneys fees and costs they claim. Defendants may file any opposition to APM's application within ten days after the date of that submission.

### CONCLUSION

For the foregoing reasons, Layton is liable for breach of the Agreement. Layton and MM are liable for tortious interference with APM's contractual and prospective business relations. Layton and MM are jointly and severally liable for damages in the amount of $51,433. APM's claim for injunctive relief is denied. APM shall supplement the record to demonstrate the amount and reasonableness of their requested attorneys' fees and court costs.

Counsel shall promptly confer and submit a stipulated or proposed form of judgment in accordance with this opinion and 10 *Del. C.* § 4734.

IT IS SO ORDERED.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 16

Not Reported in A.2d, 2004 WL 1878784
**(Cite as: Not Reported in A.2d)**

Del.Ch.,2004.
All Pro Maids, Inc. v. Layton
Not Reported in A.2d, 2004 WL 1878784

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy

Page 1

2005 WL 705341 (D.Del.), 2005 Copr.L.Dec. P 28,972

**(Cite as: 2005 WL 705341 (D.Del.))**

**Motions, Pleadings and Filings**

United States District Court,
D. Delaware.
**APPFORGE,** INC., Plaintiff,
v.
**EXTENDED** SYSTEMS, INC., **Extended** Systems
of Idaho, Inc., **Extended** Systems,
Ltd., **Extended** Systems Benelux B.V., **Extended**
Systems, GmbH, and **Extended**
Systems France, Sarl. Defendants.
**No. C.A.04-704-GMS.**

March 28, 2005.
Steven J. Balick, Ashby & Geddes, Wilmington,
DE, for Plaintiff.

Allen M. Terrell, Jr., Richards, Layton & Finger,
Wilmington, DE, for Defendants.

*MEMORANDUM*

SLEET, J.

I. INTRODUCTION

*1 On June 29, 2004, AppForge, Inc.
("AppForge") filed a complaint against Extended
Systems, Inc. ("ESI"), alleging the following federal
claims: copyright infringement, pursuant to 17
U.S.C. § 501, trademark infringement, pursuant to
15 U.S.C. § 1114, and unfair competition, pursuant
to 15 U.S.C. § 1125(a). The complaint also alleges
deceptive trade practices and unjust enrichment,
pursuant to Delaware state law. On August 12,
2004, AppForge amended its complaint to add
Extended Systems of Idaho, Inc. ("ESII"), Extended
Systems, Ltd. ("ESI Ltd."), Extended Systems
Benelux B.V. ("ESI Benelux"), Extended Systems,
GmbH ("ESI GmbH"), and Extended Systems
France, Sarl. ("ESI France") as defendants. [FN1]

FN1. ESI Ltd., ESI Benelux, ESI GmbH,
and ESI France are foreign subsidiaries of
ESI. The court, therefore, will refer to
these defendants collectively as the "ESI
Foreign Subsidiaries."

Presently before the court is ESI and ESII's
(collectively, the "defendants") motion to dismiss
the complaint or stay the action and compel
arbitration. For the following reasons the court will
grant the motion to stay and compel arbitration.

II. BACKGROUND

A. Mobile Computing Devices [FN2]

FN2. The court is not completely familiar
with the technology behind mobile
computing devices, "application" software,
and "platform" software. Therefore, the
court has relied on the amended complaint
and the parties' assertions to familiarize
itself with the technology involved in this
case. The court is relying on the
above-mentioned documents only for
background and informational purposes.

Mobile computing devices allow users wireless
access to services that previously required access to
a "land line" wire connection. Mobile computing
devices include the personal digital assistant
("PDA") and Blackberry0, which are handheld
devices that can combine computing, telephone,
Internet, access to data, and networking features.
There are two categories of software that reside on
mobile computing devices: (1) "application"
software, a complex software program or group of
programs designed for the users of computing
devices, for example, spreadsheets and computer
games; and (2) "platform" or "operating system"
software, which provides the overall framework
within which the applications operate, for example,
Microsoft Windows®.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 2

2005 WL 705341 (D.Del.), 2005 Copr.L.Dec. P 28,972

**(Cite as: 2005 WL 705341 (D.Del.))**

A user is unable to run an application unless the device has a compatible platform. Many applications can run on either one or a very small number of platforms. For example, the Microsoft Word for Windows® word processing application can run on the Microsoft Windows® operating system, but cannot run on the Macintosh® operating system. Therefore, a developer must create a separate and distinct version of Microsoft Word® for the Macintosh® operating system. This requires a significant amount of time and effort. Applications that run on multiple platforms, "cross-platform" or "multi-platform" applications, however, allow developers to write one application for use on a variety of operating systems. Cross-platform applications are considered valuable because they allow developers to save time, effort, and expense associated with creating and maintaining one application for each platform.

B. The Parties' Software

AppForge is a provider of software that allows its customers to design, develop, and utilize custom built applications that will run on mobile computing devices. According to the complaint, in September 2001, AppForge released for sale the APPFORGE MOBILEVB software, APPFORGE BOOSTER PLUS software, and the Piedmont SDK software (collectively, the "AppForge Software"). APPFORGE MOBILEVB and APPFORGE BOOSTER PLUS simplify the application development process. APPFORGE MOBILEVB includes pre-programmed modules and allows developers to create applications in the Visual Basic ® computer language. APPFORGE BOOSTER PLUS allows applications created with APPFORGE MOBILEVB to run on the mobile computing devices. Applications created using APPFORGE MOBILEVB can run on hundreds of mobile computing devices, provided that the device contains a version of APPFORGE BOOSTER PLUS that works in conjunction with the operating system on that device.

*2 Piedmont SDK is a software development tool that allows developers to create their own custom modules, in addition to the pre-programmed

modules contained in APPFORGE MOBILEVB. It also enables developers to create "controls," or objects in a window that can be viewed by the user, for example, pull-down menus. The modules and controls created with Piedmont SDK are cross-platform and run on all mobile computing devices containing a compatible version of APPFORGE BOOSTER PLUS.

ESI is a holding company operating in the United States through its wholly-owned subsidiary ESII. Specifically, ESII develops software and markets it to application software developers for mobile computers. The developers then have the ability to write applications that take advantage of ESII's capabilities to access server data and thereby allow mobile computer users to tap into databases, e-mail, or other data on a server. According to ESII, it has implemented various techniques to facilitate server data access.

In 2001, ESII marketed and sold two software products, the XTNDConnect Mobile Objects ("XCMO") and XTNDConnect synchronization solution ("Sync Product"). XCMO is a solution for application developers that enables mobile/handheld and PC applications to easily integrate live interaction with centrally located server-based objects. [FN3] The Sync Product allows a user to take information stored on a mobile computing device and transfer it to a server or another computer. [FN4] In 2004, ESII discontinued selling XCMO and the Sync Product and began marketing new software called "OneBridge." OneBridge is a combination of both techniques that ESII had previously marketed separately in the Sync Product and XCMO.

> FN3. XCMO implements a technique that utilizes an essentially persistent connection between the mobile computer and the server, so that the applications on the mobile computer manipulate the server data directly via the essentially persistent connection, rather than manipulating a local copy of data. (D.I. 27, at 2.).

> FN4. The Sync Product implements a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

2005 WL 705341 (D.Del.), 2005 Copr.L.Dec. P 28,972

**(Cite as: 2005 WL 705341 (D.Del.))**

technique that "synchronizes" two databases so that changes in one are reflected in another. That is, a database on the mobile computer is established to mirror a subset of data on the server. An application on the mobile computer then manipulates the local database. The two databases are then occasionally synchronized. (*Id.*)

The Sync Product software and its corresponding software component of OneBridge include cross-platform controls that ESII developed using AppForge's Piedmont SDK. According to ESII, application developers who purchase its software may or may not choose to utilize the cross-platform controls. If a user chooses to utilize the cross-platform controls, he or she can obtain a license to use the Booster Plus0 program from AppForge.

C. The Agreements

On October 31, 2001, AppForge and ESII entered into two license agreements, an Incorporation License Agreement ("ILA") and a Reseller Agreement. [FN5] Under the terms of the ILA, AppForge granted ESII a non-exclusive license to use Piedmont SDK for the "sole and limited purpose of creating the Software to be incorporated into the XCMO Product (in executable form only)." (D.I. 20, Ex. 1 ¶ 2.) The ILA also provides that Piedmont SDK "shall only be used with your Customer Products, and may not be sold, licensed, leased, transferred, published or used separately from the Customer Products." (*Id.*) The ILA defines the terms "Software" and "Customer Products." Software means "the set of cross-platform controls that integrate ESI client-side technology with AppForge Booster Plus0 for ESI created from the SDK ..." (*Id.* ¶ 1.4.) The Customer Product is the "XTNDConnect Mobile Objects ("XCMO") ..." (*Id.* ¶ 1.7.) The ILA, therefore, grants ESII a license to use the AppForge Software with only XCMO. [FN6] In addition, the ILA does not contain an arbitration clause.

FN5. The court notes that ESII is the only

defendant that is a signatory to the agreements with AppForge.

FN6. The defendants assert that the ILA grants ESII rights and licenses not necessary to a resolution of the issues in the present case. AppForge disagrees, maintaining that the agreements were entered into in conjunction with one another and signed by the same party representatives. The court will discuss whether the ILA is necessary to resolve the motion to compel in section IV.B., below.

*3 On October 31, 2001, ESII and AppForge also entered into a Reseller Agreement because ESII "desire[d] to bundle AppForge proprietary software with ... [its] proprietary software," and AppForge "desired ... [ESII] to bundle ... [its] proprietary software with AppForge's proprietary software." (D.I.20, Ex. 2.) The Reseller Agreement grants ESII two copyright licenses, a license to use certain AppForge trademarks, and a license to use the AppForge Software for marketing and demonstrations (*See id.* §§ 1.2.1, 1.2.2, 1.2.4, 1.2.5.) The Reseller agreement contains an arbitration clause. [FN7]

FN7. The arbitration clause provides:
All disputes arising out of or in connection with this Agreement shall be solely and finally settled by arbitration, which shall be conducted in accordance with the Rules of the American Arbitration Association (the "Rules") in Delaware by three arbitrators selected in accordance with the Rules. Judgment on the award of the arbitrators may be entered in any court having jurisdiction over the party against which enforcement of the award is being sought.
D.I. 20, Ex. 2 § 7.10.

The present case arose when ESII began marketing its OneBridge software. According to the amended complaint, in the third quarter of 2003, the defendants stopped selling XCMO and the Sync Product and released OneBridge. Between the fall

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of 2003 and June 2004, AppForge attempted to discuss with ESII its use of the AppForge Software in connection with OneBridge and whether ESII owed AppForge any licensing fees. ESII responded, stating that it discontinued selling XCMO and, therefore, did not owe AppForge any licensing fees. AppForge then filed the present action. In response, ESI and ESII filed the present motion to compel arbitration and to dismiss or stay the case.

D. The Parties' Positions

ESI and ESII maintain that the arbitration clause covers all of AppForge's claims. They assert that AppForge's claims are all dependent upon whether ESII has acted in accordance with its contractual rights, an issue that falls within the arbitration clause because it "aris[es] out of or in connection with" the Reseller Agreement. It is the defendants position that the Reseller Agreement grants royalty-bearing rights and non-royalty bearing rights. According to the defendants, when XCMO was distributed as a stand-alone product, they bundled AppForge's Booster Plus0 with it, as permitted in Section 1.2.1 of the Reseller Agreement, and paid AppForge royalties. However, because OneBridge had a greater variety of options, the defendants determined that it became less certain that application developers would require Booster Plus0. The defendants, therefore, decided not to bundle Booster Plus0 with OneBridge; that is, the defendants did not exercise their royalty-bearing rights under the Reseller Agreement. In marketing OneBridge, the defendants instead exercised their non-royalty bearing rights to leverage the Piedmont SDK to create a set of cross-platform controls under section 1.2.2 of the Reseller Agreement. In other words, the defendants assert that section 1.2.2 does not restrict their rights to any particular brand name or type of software. Rather, the provision allows them to use Piedmont SDK to develop cross-platform controls and, thereafter, grants them "a perpetual sublicensable license and right to the use of such cross-platform controls." (D.I. 27, at 5-6.)

Conversely, AppForge contends that the claims in the case do not in any way arise out of, or in connection with, the Reseller Agreement because they relate to the defendants' use of the AppForge Software in connection with the OneBridge product, not the XCMO product or the Sync Product. According to AppForge, the Reseller Agreement and the ILA grant ESII a limited license to use the AppForge Software, but only in connection with XCMO and the Sync Product. Thus, the two agreements do not relate to or address the terms by which the defendants may use the AppForge Software in connection with products other than XCMO and the Sync Product.

*4 AppForge explains why its claims do not arise under the Reseller Agreement. According to AppForge, its claims for copyright infringement are based solely on the unauthorized use and copying of its software in connection with OneBridge. Its trademark infringement, unfair competition, and deceptive trade practices claims are based on the unauthorized, confusing, and misleading use by the defendants in connection with the OneBridge product of marks either identical or substantially similar to AppForge trademarks. Its unjust enrichment claim is based upon the defendants use of the AppForge Software and trademarks in connection with marketing and selling OneBridge. Thus, all of AppForge's claims relate to OneBridge and are outside the scope of the arbitration clause.

Lastly, AppForge contends that a proposed stay would be inefficient and complicate matters because ESII is the only party to the Reseller Agreement and AppForge only could assert its claims against ESII in arbitration. Allowing the non-arbitrable claims to proceed, AppForge maintains, would not impair the arbitration because ESII is the only defendant that is a party to the arbitration and thus the arbitrator would not make any determinations regarding the claims between AppForge and ESI.

III. STANDARD OF REVIEW

The Federal Arbitration Act ("FAA") provides that written agreements to arbitrate disputes "shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. Pursuant to the FAA, the court should stay an action and compel arbitration when, in a pending suit, "any

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

2005 WL 705341 (D.Del.), 2005 Copr.L.Dec. P 28,972

**(Cite as: 2005 WL 705341 (D.Del.))**

issue is referable to arbitration." 9 U.S.C. §§ 3,4. A district court also has the discretion to dismiss an action if all the issues raised are arbitrable and must be submitted to arbitration. *See BAE Sys. Aircraft Controls, Inc. v. Eclipse Aviation Corp.,* 224 F.R.D. 581, 585 (D.Del.2004) (citing cases).

Before a court can compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1-16 (2003) , the court must determine (1) whether the parties entered into a valid arbitration agreement, and (2) whether the relevant dispute is arbitrable, meaning that it falls within the language of the arbitration agreement. *See John Hancock Mutual Life Insurance Co. v. Olick,* 151 F.3d 132, 137 (3d Cir.1998) (stating that where a dispute regarding an arbitration agreement is brought before a district court, the scope of the court's authority to become involved is defined by the FAA. *Id.* at 136-37)). In conducting its review, a court should apply the ordinary principles of contract law. *See* 9 U.S.C. § 2 ; *First Options of Chicago v. Kaplan,* 514 U.S. 938, 945, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) (To determine "whether the parties agreed to arbitrate a certain matter ..., courts generally ... should apply ordinary state-law principles that govern formation of contracts.") If a contract contains an arbitration clause, a presumption of arbitrability arises. This presumption may be overcome only if "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *See Sharon Steel Corp. v. Jewell Coal & Coke Co.,* 735 F.2d 775, 778 (3d Cir.1984). In addition, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *see First Liberty Inv. Gp. v. Nicholsberg,* 145 F.3d 647, 653 (3d Cir.1998); *Stateside Mach. Co. v. Alperin,* 591 F.2d 234, 240 (3d Cir.1979) ("doubtful issues regarding the applicability of an arbitration clause are to be decided in favor of arbitration").

IV. DISCUSSION

*5 In the present case, AppForge does not attack the validity of the arbitration clause of the Reseller

Agreement, but it does assert that its claims fall outside the contours of that agreement. Because the scope of the arbitration agreement is at issue, the court may " 'engage in a limited review to ensure that the dispute is arbitrable' " and, if appropriate, enter an order to compel or enjoin arbitration. *Id.* (quoting *PaineWebber v. Hartman,* 921 F.2d 507, 511 (3d Cir.1990)). The court, in making its review, must answer two questions with respect to whether ESII can compel AppForge to arbitrate its claims: (1) whether the rights and obligations controlling resolution of AppForge's claims arise chiefly under legal principles that would be applicable even if the parties had not entered a contract, or under the Reseller Agreement; and (2) whether it can be said with positive assurance that the arbitration clause in the Reseller Agreement is not susceptible to an interpretation that covers those claims. *See Image Software, Inc. v. Reynolds, et al.,* 273 F.Supp.2d 1168, 1173 (D.Col.2003). With respect to ESI, the court must determine whether, as a non-signatory to the Reseller Agreement, ESI can compel AppForge to Arbitrate. Lastly, if the court determines that there are both arbitrable and non-arbitrable claims, it must then determine whether to stay the non-arbitrable claims or let them proceed. The court will discuss each of these issues in turn.

A. Whether the Rights and Obligations Controlling Resolution of AppForge's Claims Against ESII Arise Chiefly Under the Reseller Agreement [FN8]

> FN8. The court will address ESI, a non-signatory to the agreements, in section IV.C. below.

1. AppForge's Copyright Claims

In a copyright infringement action between two parties who are joint signatories to a contract concerning copyrighted property and providing that lawsuits between the parties shall be settled by arbitration, two resolutions are possible:
(1) the court could give effect to that contractual provision no less than to the arbitration clause in a straight contract dispute; or (2) given that the plaintiff had opted, *ex hypothesi,* to treat the contract ... of no operative effect (at least for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

2005 WL 705341 (D.Del.), 2005 Copr.L.Dec. P 28,972

(Cite as: 2005 WL 705341 (D.Del.))

Page 6

purposes fo the lawsuit), and is relying on copyright principles that are applicable even when the defendant had never entered into a contract with the plaintiff, the court could determine that it should treat such an infringement action no differently from any other infringement case.
3 NIMMER ON COPYRIGHT § 10.15[B] (2004). Under the first resolution, the case would be arbitrable and under the second it would not. *See id.* Thus, based on this distinction between infringement claims postulated on ownership rights that arise under contract and those that must be construed under the Copyright Act, the question that a court must consider in a given case is "where ... the rights and obligations [that] control the resolution of the dispute arise." *Image Software,* 273 F.Supp.2d at 1173.

*6 Here, the rights and obligations governing the resolution of whether ESII's use of AppForge's software is unlawful arise under the Reseller Agreement rather than under the Copyright Act. For example, as previously discussed, ESII contends that the Reseller Agreement grants it a non-royalty based, perpetual right to use Piedmont SDK to develop cross-platform controls. ESII further contends that it exercised this right when it used Piedmont SDK to develop cross-platform controls for OneBridge. AppForge, however, maintains that the Reseller Agreement relates to the terms on which ESII could use AppForge's software only in connection with XCMO and the Sync Product. Thus, the merits both of AppForge's claims and ESII's defense turn on the scope and construction of the parties' rights under the Reseller Agreement. As such, the court cannot say that ESII's actions infringe on AppForge's substantive property rights in its software under the Copyright Act.

2. AppForge's Federal Trademark and Unfair Competition Claims, and State Law Deceptive Trade Practices Claim

Having determined that AppForge's copyright rights and obligations arise under the Reseller Agreement, the court must determine whether it should reach a different result with respect to

AppForge's trademark, unfair competition, and deceptive trade practices claims (collectively, the "trademark-based claims"). AppForge makes the same assertions with respect to these claims as it does with its copyright claims. The court is not persuaded and finds that, as with its copyright claims, AppForge's trademark-based claims arise chiefly under the Reseller Agreement because their merits turn on the scope of the rights afforded to the defendants under that agreement.

AppForge's trademark-based claims are based on the alleged unauthorized, confusing, and misleading use by the defendants of marks either identical or substantially similar to AppForge's trademarks, in connection with the OneBridge product. (D.I. 20, at 15.) AppForge alleges that ESI's website allows persons throughout the world to download promotional and instructional materials for the OneBridge Mobile Data Suite software that use the AppForge trademarks "on hundreds of occasions," and refers to APPFORGE BOOSTER PLUS as "AppForge Booster Plus from Extended Systems." Under the terms of the Reseller Agreement, AppForge granted ESII a "personal, nontransferable, nonexclusive, royalty-free right and license to use its trademarks ... solely in connection with the promotion and sale of, or identifying the Products." (D.I. 20, Ex. 2 § 1.2.4.) The "Products" are defined as "any and all AppForge proprietary software ..." ( *Id.* § 1.1.) The license does not limit ESII's use of AppForge's trademarks to any of ESII's software. Rather, the license is directed at, and requires, ESII to use AppForge's trademarks in connection with any promotion or identification of the AppForge Software. Because the license grants ESII an unlimited right to use AppForge's trademarks in connection with the AppForge Software, whether ESII acted in accordance with those rights, when it allegedly used AppForge's trademarks unlawfully in marketing OneBridge, arise out of or in connection with the Reseller Agreement.

3. AppForge's Unjust Enrichment Claim

*7 The court must next determine whether AppForge's unjust enrichment claim also arises under the Reseller Agreement. As with the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 7

2005 WL 705341 (D.Del.), 2005 Copr.L.Dec. P 28,972

**(Cite as: 2005 WL 705341 (D.Del.))**

AppForge's other claims, the court concludes that the unjust enrichment claim arises out of or in connection with the Reseller Agreement. The amended complaint alleges that the defendants' use of AppForge's software and trademarks in connection with OneBridge unjustly enriched the defendants. AppForge's unjust enrichment claim, therefore, is based on whether the defendants' used its software and trademarks unlawfully and, as discussed above, the rights and obligations controlling resolution of those claims arise chiefly under the Reseller Agreement. It follows, then, that because AppForge's unjust enrichment claim is based on the same factual allegations as its trademark and copyright claims, the rights and obligations controlling its resolution must also arise chiefly under the Reseller Agreement.

**B. Whether It Can be Said with "Positive Assurance" that the Arbitration Clause is Not Susceptible to an Interpretation that Covers AppForge's Claims Against ESII**

Having determined that AppForge's claims against ESII arise under the Reseller Agreement, the court must now determine whether it can be said with positive assurance that the arbitration clause in section 7.10 of the agreement is not susceptible to an interpretation that covers AppForge's claims. In other words, the court must determine whether AppForge can overcome the presumption that the dispute is subject to arbitration.

AppForge asserts that because its claims are outside the Reseller Agreement, the arbitration clause is not susceptible to an interpretation that covers those claims. It relies on the "plain language" of the Reseller Agreement and the ILA for support. (D.I. 20, at 12.) The court finds AppForge's assertions unconvincing for several reasons. First, the arbitration clause is contained in the Reseller Agreement, not the ILA. Thus, the presumption is that AppForge's claims are subject to arbitration under the Reseller Agreement and not the ILA. In addition, the ILA is a fully integrated contract that stands separately from the Reseller Agreement, and is governed by different state laws. [FN9] Moreover, while the ILA incorporates certain

provisions of the Reseller Agreement, the Reseller Agreement does not reciprocate. For example, the ILA states that Piedmont SDK "shall only be used with your Customer Products [*i.e.* XCMO] and may not be sold, licensed, leased, transferred, published or used separately from the Customer Products." This language, however, is absent from the Reseller Agreement. The court, therefore, cannot read the ILA's grant of a limited license to use the AppForge Software only in connection with XCMO and the Sync Product into the Reseller Agreement. [FN10]

> FN9. The ILA states: "[t]his agreement, including, without limitations, all provisions of the Reseller Agreement referenced herein, sets forth the entire agreement between you and AppForge and may be amended only in writing signed by both parties." (D.I. 20, Ex. 1 § 8.1.) Furthermore, the ILA is governed by Georgia law, while the Reseller Agreement is governed by Delaware law. (*Id.* § 8.2.)

> FN10. It is also notable that the ILA only grants ESII a copyright license. Thus, AppForge could not rely on the ILA to support its assertions regarding its trademark-based and unjust enrichment claims.

Second, as to AppForge's copyright claims, the Reseller Agreement grants ESII two distinct copyright licenses in the AppForge Software. Pursuant to the "Non-exclusive Appointment/License," section 1.2.1, AppForge grants ESII a "nonexclusive right and license to use the AppForge Booster Plus0 only as a bundled product for resale with [XCMO] and the ESI Sync Product." Under the "Right to Use Technology," section 1.2.2, AppForge grants ESII the right to "leverage the Piedmont Software Development Kit [SDK] to create a set of cross-platform controls that integrate Reseller's [ESII's] client-side technology with AppForge Booster Plus0. Upon creation of such cross-platform controls, AppForge shall be deemed to have granted Reseller [ESII] a perpetual, sub-licensable license and right to the use of such cross-platform controls." Absent from the second

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

2005 WL 705341 (D.Del.), 2005 Copr.L.Dec. P 28,972

(Cite as: 2005 WL 705341 (D.Del.))

Page 8

grant of rights is the language that ESII may use Piedmont SDK only with XCMO and the Sync Product. Thus, to the degree that ESII has a colorable claim that AppForge granted it a non-royalty based license to use Piedmont SDK without restricting its use to any brand name or type of software, it seems that the arbitration clause of the Reseller Agreement would cover the parties' dispute. At the very least, the court cannot say with "positive assurance" that the arbitration clause is not susceptible to an interpretation that covers AppForge's copyright claims.

*8 The same is true of AppForge's trademark-based claims. As previously discussed, the Reseller Agreement grants ESII a royalty-free license to use its trademarks and requires ESII to use AppForge's trademarks when promoting and/or identifying AppForge's proprietary software. AppForge alleges that the defendants are unlawfully using its APPFORGE, APPFORGE BOOSTER, APPFORGE & Design, and APPFORGE MOBILEVB trademarks in connection with OneBridge. ESII, however, contends that it merely provides an Internet hyperlink to AppForge's website, where an end user could download a free, temporary evaluation copy of AppForge Booster Plus0 or purchase a non-evaluation version of the software. According to ESII, end users that are directed to the AppForge website who desire to purchase AppForge Booster Plus0 do so through AppForge, not ESII. Thus, ESII claims that it is using AppForge's trademarks to identify AppForge proprietary software, as required by the Reseller Agreement. To the extent ESII has a colorable claim that AppForge's trademark-based claims are disputes about the scope of the trademark license, the court cannot say with positive assurance that the arbitration clause is not susceptible to an interpretation that covers those claims. [FN11]

> FN11. Because AppForge's unjust enrichment claim is based in ESII's allegedly unlawful use of AppForge's copyrighted software and trademarks, the court cannot say with positive assurance that the arbitration clause is not susceptible to an interpretation that also covers this claim.

C. Whether ESI, a Non-Signatory to the Reseller Agreement, Can Compel AppForge to Arbitrate Its Claims

ESI maintains that the arbitration in the present case should not be limited to AppForge and ESII, the two signatories to the Reseller Agreement. According to ESI, as the parent company of ESII, it can enforce the Reseller Agreement under the theory of equitable estoppel and as a third party beneficiary. The court disagrees. Generally, arbitration clauses can be enforced only by signatories--a non-signatory cannot be bound unless it is bound " 'under traditional principles of contract and agency law.' " *See, e.g., E.I. Dupont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.,* 269 F.3d 187, 194 (3d Cir.2001) (citing *Bel-Ray Co., Inc. v. Chemrite Ltd.,* 181 F.3d 435, 444 (3d Cir.1999)); *Dayhoff v. H.J. Heinz Co.,* 86 F.3d 1287, 1296 (3d Cir.1986). "[A] court may only compel a party to arbitrate where that party has entered into a written agreement to arbitrate that covers the dispute." *Bel-Ray,* 181 F.3d at 444 ("Arbitration is strictly a matter of contract. If a party has not agreed to arbitrate, the courts have no authority to mandate that he do so."). ESI asserts that it can compel AppForge to arbitrate under the theory of equitable estoppel and as third party beneficiary to the Reseller Agreement. These are recognized principles of contract law, which are applicable when determining whether to compel a party to arbitrate. *See E.I. Dupont,* 269 F.3d at 195 (citing cases). The court will consider each of ESI's assertions in turn. [FN12]

> FN12. In its reply brief to the motion to compel, ESI seems to have withdrawn from its earlier contentions that it can compel arbitration. *See* D.I. 27, at 8 ("Whether ESI by itself could compel arbitration is a question the court need not decide. The only issue is whether the claims against ESI and the other defendants should be dismissed or stayed pending the arbitration.") Nevertheless, the court will address the equitable estoppel

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                       Page 9

2005 WL 705341 (D.Del.), 2005 Copr.L.Dec. P 28,972

**(Cite as: 2005 WL 705341 (D.Del.))**

and third party beneficiary theories.

a. Equitable Estoppel

Under the theory of equitable estoppel, courts have bound non-signatories to arbitrate in two circumstances: (1) "when the non-signatory knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement," *Thomason-CSF, S.A. v. Am. Arbitration Assoc.,* 64 F.3d 773, 778 (2d Cir.1995); and (2) "at the non-signatory's insistence because of 'the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the non[-]signatory's obligations and duties in the contract ... and [the fact that] the claims were intimately founded in and intertwined with the underlying contract obligations.' " *Id.* at 779. It is not clear to the court whether ESI contends that the first, second, or both circumstances apply in the present case, because the only assertion that ESI tenders is the statement that "courts have recognized 'a series of cases in which signatories were held to arbitrate related claims against parent companies who were not signatories to the arbitration clause." (D.I. 14, at 5.) According to ESI, "[t]hat is exactly the situation among the parties here" and, "[a]s a result, the Plaintiff is estopped from avoiding the arbitration clause." *Id.* Absent from ESI's brief, remarkably, is any discussion of either the fact that it knowingly exploited the Reseller Agreement despite having never signed it, or the close relationship between ESII and ESI, the relationship of the alleged wrongs to ESI's obligations and duties in the Reseller Agreement and the fact that the claims were intertwined with the underlying contractual obligations. *See Thomason-CSF,* 64 F.3d at 779. As such, the court concludes that ESI cannot enforce arbitration under the theory of equitable estoppel.

b. Third Party Beneficiary

*9 ESI next maintains that it can compel arbitration because it is a third party beneficiary to the Reseller Agreement. Courts have held that non-signatory third party beneficiaries can compel arbitration against signatories of arbitration agreements. *See*

*E.I. Dupont,* 269 F.3d at 195 (noting that "whether seeking to avoid or compel arbitration, a third party beneficiary has been bound by contract terms where its claim arises out of the underlying contract to which it was an intended third party beneficiary.") Under Delaware law, a party must meet three conditions to qualify as a third party beneficiary:

> (a) the contracting parties must have intended that the third party beneficiary benefit from the contract, (b) the benefit must have been intended as a gift or in satisfaction of a pre-existing obligation to that person, and (c) the intent to benefit the third party must be a material part of the parties' purpose in entering into the contract.

*Id.* at 196 (citing *Guardian Constr. Co. v. Tetra Tech Richardson, Inc.,* 583 A.2d 1378, 1386 (1990) ). ESI asserts that it is entitled to enforce the arbitration clause as a third party to the Reseller Agreement because AppForge intended to benefit ESI at the time it entered the contract with ESII. According to ESI, evidence of AppForge's intent to benefit it can be found in the press releases each company issued after signing the agreement--that is, AppForge's press release referred to ESI by its ticker symbol, not ESII. ESI's argument is weak at best. While referring to ESI by its ticker symbol may be evidence that AppForge and ESII intended ESI to benefit from the Reseller Agreement, ESI has not made any assertions regarding the remaining factors necessary to establish its status as a third party beneficiary. Indeed, the record is devoid of any evidence that ESI's purported benefit was intended as a gift or in satisfaction of a pre-existing obligation it was owed. Additionally, the record does not even suggest that AppForge and ESII's alleged intent to benefit ESI was a material part of their purpose in entering the Reseller Agreement. ESI, therefore, cannot enforce arbitration as a third party beneficiary to the Reseller Agreement.

D.    Whether    the    Court    Should    Stay    the Non-Arbitrable Claims

The FAA provides for a stay of the proceedings when "any issue" is referable to arbitration. *See* 9 U.S.C. § 3. That is a court must stay its proceedings if it is satisfied that an issue before it is arbitrable under the agreement. *Shearson/Am. Exp., Inc. v.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                   Page 10

2005 WL 705341 (D.Del.), 2005 Copr.L.Dec. P 28,972

(Cite as: 2005 WL 705341 (D.Del.))

*McMahon,* 482 U.S. 220, 226, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987); *see Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 885 F.2d 1149, 1156 (3d Cir.1989) (noting that the *Shearson* Court "stressed that if an issue is arbitrable under the agreement, the Arbitration Act leaves a court without discretion"). Alternatively, a district court has the discretion to dismiss an action if all of the issues raised are arbitrable. *See BAE Sys. Aircraft Controls, Inc. v. Eclipse Aviation Corp.,* 224 F.R.D. 581, 585 (D.Del.2004).

*10 In the present case, the court has determined that AppForge's claims against ESII are arbitrable. AppForge's claims against ESI and the ESI Foreign Subsidiaries, however, are not arbitrable because: (1) ESI and the ESI Foreign Subsidiaries are not signatories to the agreement; (2) equitable estoppel does not apply to ESI; (3) ESI is not a third party beneficiary; and (4) the ESI Foreign Subsidiaries have not joined the motion to compel. Thus, the court must decide whether it should stay the non-arbitrable claims.

AppForge contends that regardless of whether some or all of its claims against the defendants are arbitrable, the court should stay only the arbitrable claims because staying all claims will force AppForge to either (a) forego its arbitrable claims, or (b) wait months, if not years, before the court hears the non-arbitrable claims. (D.I. 20, at 16-17.) ESII and ESI assert that arbitrating concurrently with the litigation would be inefficient because it would (1) require the parties to resolve their controversies in two forums, and (2) impair the arbitration because of the potential preclusive effect of the litigation. (D.I. 14, at 8.) ESII and ESI further assert that staying the case would streamline subsequent proceedings before the court, and that AppForge would not be prejudiced by an inability to pursue its claims against the defendants other than ESII because "all the defendants in the case will submit to be bound by any factual adjudications in the arbitration." (D.I. 14, at 7-8; D.I. 27, at 9.) The court agrees with ESI and ESII. Because AppForge's claims against ESII are arbitrable, AppForge's claims against ESI and the ESI Foreign Subsidiaries are similar, if not identical, to its

claims against ESII, and ESI and the ESI Foreign Subsidiaries have conceded that they will be bound by any factual adjudications in the arbitration, the court concludes that staying the non-arbitrable claims is the proper result. Accordingly, the court will grant ESII's motion to compel and stay the case pending the outcome of arbitration.

### ORDER
For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:
1. ESI and ESII's Motion to Compel Arbitration (D.I.6, 13) is GRANTED as to ESII and DENIED as to ESI.
2. The case shall be STAYED pending the outcome of arbitration.
3. ESI, ESI Limited, ESI Benelux, ESI GmbH, and ESI France shall be bound by any factual adjudications in the arbitration.

2005 WL 705341 (D.Del.), 2005 Copr.L.Dec. P 28,972

**Motions, Pleadings and Filings (Back to top)**

• 1:04CV00704 (Docket)

(Jun. 29, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                    Page 1

Not Reported in F.Supp.2d, 1999 WL 387329
**(Cite as: Not Reported in F.Supp.2d)**

Not Reported in F.Supp.2d, 1999 WL 387329
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
ARMSTRONG WORLD INDUSTRIES, INC.,
Plaintiff,
v.
ROBERT LEVIN CARPET COMPANY,
Defendant.
**No. Civ.A. 98-CV-5884.**

May 20, 1999.

Christopher W. Mattson , Lancaster, PA, David
Alan Shirlen , Womble, Carlyle, Sandridge & Rice,
Winston-Salem, NC, for Armstrong World
Industries, Inc., Plaintiff.
G. Thompson Bell, III , Stevens and Lee , Reading,
PA, Jeffrey D. Bukowski , Stevens & Lee, P.C.,
Reading, PA, for Robert Levin Carpet Company,
Defendant.
Jeffrey D. Bukowski , Stevens & Lee, P.C.,
Reading, PA, for Robert Levin Carpet Company,
Counter-Claimant.
Christopher W. Mattson , Lancaster, PA, David
Alan Shirlen , Womble, Carlyle, Sandridge & Rice,
Winston-Salem, NC, for Armstrong World
Industries, Inc., Counter-Defendant.

*MEMORANDUM*

GAWTHROP, J.
**\*1** Before the court in this diversity action,
Erie-bound to Pennsylvania, is plaintiff Armstrong
World Industries' ("Armstrong") motion to dismiss
defendant Robert Levin Carpet Company's ("Levin"
) counterclaims for breach of contract (Count I),
breach of the duty of good faith and fair dealing
(Count II), fraud (Count III), negligent
misrepresentation (Count IV), equitable/promissory
estoppel (Count V), unjust enrichment (Count VI),
and adjustment of account (Count VII). For the

following reasons, I shall grant Armstrong's motion
to dismiss Levin's counterclaims for: (1) breach of
contract, (2) breach of duty of good faith and fair
dealing, (3) fraud, (4) negligent misrepresentation,
(5) equitable/promissory estoppel, and (6) unjust
enrichment. However, for the following reasons, I
shall deny Armstrong's motion to dismiss Levin's
counterclaim for adjustment of account.

I. Background

The pertinent facts, according to Levin, the
non-moving party, are as follows. From 1943 until
1996, Levin was a wholesale distributor of
Armstrong's products. Levin's distribution territory
covered northeastern Ohio. Prior to 1993,
Armstrong's standard distribution agreement had a
term of three years, which, every three years, had
been renewed. However, in 1995, Armstrong
informed its distributors that it was changing the
term of its standard distribution agreement from
three years to one year.

At this time, Armstrong also told its distributors that
they must grow their market or face possible
elimination as an Armstrong wholesaler. In reliance
on this information, Levin decided to purchase the
assets of Hamburg Brothers Corporation ("Hamburg
"), an Armstrong wholesaler with wholesale
distribution rights in the Pittsburgh, Pennsylvania,
and Buffalo, New York market areas ("Hamburg
distribution rights").

Levin was required to get Armstrong's approval for
its purchase of the Hamburg distribution rights. As
part of the approval process, Levin gave Armstrong
detailed financial information, showing Levin's
substantial investment and need for a payback
period. Armstrong subsequently granted its
approval to Levin's purchase of these rights.

After Levin acquired the Hamburg distribution
rights, Levin and Armstrong, on July 1, 1996,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                  Page 2

Not Reported in F.Supp.2d, 1999 WL 387329
**(Cite as: Not Reported in F.Supp.2d)**

entered into three separate distribution agreements. These agreements gave Levin certain distribution rights for Armstrong's products in the northeastern Ohio, Pittsburgh, Pennsylvania, and Buffalo, New York market areas. The agreements also contained the following provisions:

12. This Agreement will continue for one year from the date of Agreement. Either Armstrong or Wholesaler may terminate this Agreement without cause on no less than 90 days' written notice to the other party.

...

23. This Agreement supersedes all previous or now existing arrangements or agreements between Wholesaler and Armstrong and contains the entire understanding between the parties relating to the subject matter hereof. No modification or amendment of any part of this Agreement shall be binding unless in a writing that expressly amends this Agreement that is signed by both parties.

**\*2** Distribution Agreement. FN1

> FN1. Armstrong's complaint included a copy of a distribution agreement, which each party refers to in its respective claims, counterclaims, and memoranda. Because the copy included in Armstrong's complaint was missing the agreement's first and third pages, Armstrong, on April 29, 1999, FAXed this court a complete copy of the agreement. Other than the territory covered by each agreement, the terms of the three distribution agreements at issue are identical. Compl., at ¶ 3.

Levin contends that Armstrong's agreement to permit it to acquire the Hamburg distribution rights led it reasonably to believe that it would be a distributor of Armstrong's for the foreseeable future. However, in June of 1997, Armstrong, without giving Levin 90 days written notice, purported to terminate Levin's rights under the distribution agreements.

On September 23, 1998, Armstrong brought claims in Court of Common Pleas of Lancaster County against Levin for: (1) breach of contract, (2)

account stated, and (3) unjust enrichment. On November 6, 1998, Levin removed this case to this court, and, on November 16, 1998, filed the counterclaims here at issue against Armstrong.

## II. Standard

A court should dismiss a complaint pursuant to Fed.R.Civ.P. 12(b)(6) only if it finds that the plaintiff cannot prove any set of facts, consistent with the complaint, which would entitle the plaintiff to relief. *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984). In making this determination, the court must accept as true all allegations made in the complaint, and all reasonable inferences that may be drawn from those allegations. *Rocks v. Philadelphia,* 868 F.2d 644, 645 (3d Cir.1989). The court must view these facts and inferences in the light most favorable to the plaintiff. *Id.* The court may draw these facts and inferences from the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents if the plaintiff's claims are based upon those documents. *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993).

## III. Discussion

### A. Breach of Contract (Count I)

Armstrong argues that, under the parties' June 28, 1996 distribution agreements, the parties were only contractually bound for a year. Armstrong thus avers that it, in June of 1997, was not obligated to give Levin 90 days' notice before ceasing their relationship. FN2 Accordingly, Armstrong argues that Levin's counterclaim for breach of contract should be dismissed. Levin, however, responds that a reasonable interpretation of the agreements' termination provision supports its breach of contract claim. Levin further responds that even were this provision to bar its claim, Armstrong is equitably estopped from relying on it. Accordingly, Levin argues that Armstrong's motion to dismiss this claim should be denied.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 3

Not Reported in F.Supp.2d, 1999 WL 387329
**(Cite as: Not Reported in F.Supp.2d)**

> FN2. Both parties appear to concede that, when Armstrong terminated the parties' relationship, a year had passed from the time the distribution agreements were signed. I thus assume that, in June of 1997, Armstrong informed Levin that, as of July, it was terminating their relationship.

### i. Ambiguity of Termination Provision

Armstrong argues that the distribution agreements, unambiguously call for a one-year duration-from July 1, 1996 to June 30, 1997. Thus, when it terminated its relationship with Levin in June of 1997, it was not obligated to give Levin 90-day notice, and hence did not breach the agreements. Levin, however, responds not only that the agreements' terms are ambiguous, but also that the most reasonable interpretation of the agreements is that their durations are for "*at least* one year, and after that time, it can be terminated by either party without cause on no less than 90 days' written notice. " Def.'s Mem., at 7. Levin thus argues that, under a reasonable interpretation of the agreement, Armstrong, by not giving 90 days' notice of its intent to terminate the relationship, breached the distribution agreements.

**\*3** "Under Pennsylvania law 'it is firmly settled that the intent of the parties to a written contract is contained in the writing itself .' Thus, where ... the parties have reduced their agreement to writing, Pennsylvania courts presume that the parties' mutual intent can be ascertained by examining the writing." *Duquesne Light Co. v. Westinghouse Electric Corp.,* 66 F.3d 604, 613 (3rd. Cir.1995) (quoting *Samuel Rappaport Family Partnership v. Meridian Bank,* 657 A.2d 12, 21 (Pa.Super.1995)). It is only where the writing is ambiguous that the factfinder may " examine all the relevant extrinsic evidence to determine the parties' mutual intent." *Id.* (citation omitted). In determining whether a contract is ambiguous, a court must consider two types of ambiguity-patent ambiguity and latent ambiguity. *Id.* (citation omitted). Patent ambiguity "appears on the face of the [contract]," *id.,* while latent ambiguity "arises from extraneous or collateral facts which make the meaning of a written agreement uncertain although the language thereof, on its face,

appears clear and unambiguous." *Id* . at 614 (citation omitted).

Because Pennsylvania's presumption is "that the writing conveys the parties' intent, " '[a] contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends." " ' *Id.* at 614 (quoting *Meridian Bank,* 657 A.2d at 21-22). In addition, " 'a contract is not rendered ambiguous by the mere fact that the parties do not agree on the proper construction." ' *Id.* (quoting *Meridian Bank,* 657 A.2d at 22).

Levin argues that the distribution agreements' language is patently ambiguous. FN3 Thus, in determining whether the contracts are ambiguous, I need only look at their language. After both examining the agreement, and considering Levin's argument, I find that the distribution agreements' language is unambiguous. Both parties agree that the agreements' pertinent provision is:

> FN3. Levin neither alleges nor argues that there are extraneous or collateral facts which make the meaning of the instant agreement uncertain. Levin thus neither alleges nor argues that the distribution agreements contain a latent ambiguity.

This Agreement will continue for one year from the date of Agreement. Either Armstrong or Wholesaler may terminate this Agreement without cause on no less than 90 days' written notice to the other party.Distribution Agreement, at ¶ 12. The only logical interpretation of "[t]his Agreement will continue for one year," is that the agreement will continue for one year and not more than that year. Further, this language only addresses the termination of the distribution "Agreement[s]," and not the termination of the parties' post-agreements relationship. Had the parties wished to extend the termination provision to cover their post-agreements relationship, they could have so provided. Thus, because Armstrong ceased the parties' relationship after the distribution agreements had expired, it was not obligated to give

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 1999 WL 387329
**(Cite as: Not Reported in F.Supp.2d)**

Levin notice.

#### ii. Equitable Estoppel

Levin argues that because it has alleged (1) that Armstrong, through its "actions, words, and/or deeds, and/or the course of dealing and/or performance between [the parties]," misled it into believing "that it would remain an Armstrong distributor for the foreseeable future," Countercl. at ¶ 76, (2) that Armstrong intended to and, in fact, did induce it to purchase the Hamburg distribution rights and execute the Distribution Agreements, in reliance on Armstrong's actions, *id.* at ¶ 77, and (3) that its "reliance ... was reasonable," *id.* at ¶ 78, Armstrong is estopped from using these provisions as a defense to its breach of contract counterclaim. Armstrong, however, replies that because it did not say or do anything inconsistent with the distribution agreements' term provisions, it is not equitably estopped from raising these provisions as a defense to Levin's breach of contract claim.

*4 "Equitable estoppel, a doctrine sounding in equity, acts to preclude one from doing an act differently [from] the manner in which another was induced by word or deed to expect." *Zitelli v. Dermatology Education and Research Foundation,* 633 A.2d 134, 139 (Pa.1993) (citation omitted). The doctrine applies " 'when one by his acts, representations, or admissions, or by his silence when he ought to speak out ... induces another to believe certain facts to exist and such other rightfully relies ... on such belief, [and] will be prejudiced if the former is permitted to deny the existence of such facts." ' *Id.* (quoting *In re Estate of Tallarico,* 228 A.2d 736, 741 (Pa.1967)). Once " estoppel is established, the 'person inducing the belief in ... a certain state of facts is estopped to deny that the state of facts does in truth exist, aver a different or contrary state of facts as existing at the same time, or deny or repudiate his acts, conduct or statements." *Id.* (citation omitted). The "two essential elements to estoppel" are "inducement and reliance." *Id.* (citation omitted). Equitable estoppel " may be raised either as an affirmative defense or as grounds to prevent [a party] from raising a

particular defense." *Snerberger v. BTI Americas, Inc.,* No. CIV. A. 98-932, 1998 WL 826992, at *8 ( E.D.Pa. Nov. 30, 1998) (citation omitted).

Levin has pleaded that before the parties entered into the contract, it had inferred from Armstrong's words and actions that it would be an Armstrong distributor into the "foreseeable future." However, Levin has not pleaded that Armstrong, through its acts, representations, admissions, or silence, ever led it to believe that it would not enforce the parties' written contract; nor has it pled waiver. FN4 Armstrong is thus not estopped from asserting the agreements' termination provision as a defense to Levin's breach of contract claim.

> FN4. In fact, all acts, deeds, words, or omissions that Levin cites in support of equitable estoppel occurred before the parties freely entered into the distribution agreements. Thus, because the termination provision did not even yet exist, Armstrong's alleged acts, deeds, words, or omissions could not have induced Levin into believing that Armstrong would not rely on the parties subsequently bargained-for termination provision. Had Levin pleaded (1) that Armstrong, subsequent to the parties' entering into the distribution agreements', either waived its right to rely on the termination provision, or induced it to believe that it would not rely on the provision, and (2) that it relied on this waiver or belief, Levin would have sufficiently alleged an equitable estoppel defense.

Accordingly, I shall grant Armstrong's motion to dismiss Levin's counterclaim for breach of contract.

#### B. Breach of Duty of Good Faith and Fair Dealing (Count II)

Armstrong contends that since Pennsylvania law does not permit implied contractual terms to override those which are express, and since these agreements had terms that were express, in ending

Not Reported in F.Supp.2d                                                              Page 5

Not Reported in F.Supp.2d, 1999 WL 387329
**(Cite as: Not Reported in F.Supp.2d)**

the contractual relationship after one year, that that was when the relationship ceased. Accordingly, Armstrong argues that, as a matter of law, it did not breach its contractual duty of good faith and fair dealing, and thus, that this counterclaim should be dismissed. Levin, however, responds that it is a jury question as to whether Armstrong, in terminating the parties' relationship, acted in a manner consistent with the parties' reasonable expectations. Levin further responds that because the parties had a franchisor-franchisee relationship, Armstrong, in terminating the parties' relationship, had an independent duty to act toward Levin in both good faith and a commercially reasonable manner. Levin thus argues that Armstrong's motion to dismiss this counterclaim should be denied.

*5 "The Uniform Commercial Code provision on good faith ... provides that 'every contract or duty within this title imposes an obligation of good faith in its performance or enforcement.' Good faith is defined as 'honesty in fact in the conduct or transaction concerned.' " *Duquesne Light Co.*, 66 F.3d at 617 (quoting 13 Pa.C.S. §§ 1201 , 1203 (1984)). The courts, " '[w]ith rare exception, ... use the U.C.C. good faith requirements in aid and furtherance of the parties' agreement, not to override the parties' agreement for reasons of fairness, policy, or morality." ' *Id.* (quotation omitted). Courts, thus, "generally utilize the good faith duty as an interpretive tool to determine 'the parties' justifiable expectations,' and do not enforce an independent duty divorced from the specific clauses of the contract." *Id.* (quotation omitted). Absent "a dispute about the parties' reasonable expectations under a particular term of the contract, an independent 'duty of good faith has been recognized only in limited situations." ' *Id.* at 618 (citation omitted). One of these situations is in the franchisor-franchisee relationship. *Id.*

In its counterclaim, Levin alleges that "Armstrong's purported termination of [its] distribution rights was a violation of Armstrong's duty of good faith and fair dealing toward [it]." Countercl., at ¶ 60. Levin, however, does not allege that the parties had a franchise agreement. FN5 Because Levin does not sufficiently plead a franchise agreement between the parties, FN6 I find that it has failed to state a claim

based on an independent duty of good faith and fair dealing.

> FN5. The Third Circuit has defined a franchise as follows:
> " 'in its simplest terms, a franchise is a license from the owner of a trademark or trade name permitting another to sell a product or service under the name or mark. More broadly stated, the franchise has evolved into an elaborate agreement by which the franchisee undertakes to conduct a business or sell a product or service in accordance with methods and procedures prescribed by the franchisor, and the franchisor undertakes to assist the franchisee through advertising, promotion and other advisory services.' Furthermore, the 'cornerstone of a franchise system must be the trademark or trade name of a product. It is this uniformity of product and control of its quality and distribution which causes the public to turn to franchise stores for the product." '
> *Krebs Chrysler-Plymouth v. Valley Motors,* 141 F.3d 490, 497 (3rd Cir.1998) (quotations omitted).
>
> FN6. Allegations sufficient to plead a franchisor-franchisee relationship would be, for example, that Armstrong: "(1) licensed [Levin] to use its trademarks; (2) exercised strict supervision and control over the operation and control of [Levin's business]; (3) dictated the products [Levin] could sell; and (4) benefited from [Levin's] creation of good will." *Witmer v. Exxon Corp.*, 434 A.2d 1222, 1227 n. 14 (Pa.1981). A certain amount of control by the franchisor is a necessary element of this relationship. *See Atlantic Richfield Co. v. Zurasky,* Civil Action No. 954, 1977 WL 18412, at *4 (Pa.Com.Pl. Dec. 21, 1977) (recognizing that to rely on franchise agreement defense, one must allege sufficient control by alleged franchisor).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                  Page 6

Not Reported in F.Supp.2d, 1999 WL 387329
**(Cite as: Not Reported in F.Supp.2d)**

Furthermore, as discussed, the distribution agreements did not require Armstrong to give Levin notice of its intent to terminate their post-agreement relationship. Thus, to impose such a duty upon Armstrong, one would have to create a new duty, independent from the agreements' provisions. This, however, is neither the role nor the purpose of the general duty of good faith and fair dealing.

Accordingly, I shall grant Armstrong's motion to dismiss Levin's counterclaim for breach of duty of good faith and fair dealing.

### C. Fraud (Count III) and Negligent Misrepresentation (Count IV)

Armstrong argues that Levin's counterclaims for fraud and negligent misrepresentation, based on Armstrong's alleged omissions, should be dismissed because (1) Levin has failed to allege that it owed Levin a duty to speak, (2) it, in fact, owed Levin no such duty, (3) Levin could not reasonably rely on any omissions it made, and (4) the economic-loss rule precludes these counterclaims. Levin, however, counters that Armstrong is incorrect in asserting that, for the above reasons, these claims should be dismissed. I find, under the parol evidence rule, that these counterclaims fail as a matter of law. Consequently, I will not address the parties' various arguments.

The Pennsylvania parol evidence rule "bar[s] consideration of prior representations concerning matters covered in the written contract, even those alleged to have been made fraudulently, unless the representations were fraudulently omitted from the contract." *Dayhoff, Inc. v. H.J. Heinz Co.,* 86 F.3d 1287, 1300 (3rd Cir.1996). Thus, "[i]f [a party] intend[s] to rely on ... a centrally important representation ... conveyed [by another] in the course of the negotiations ... [it] should ... insist[ ] that the representation be set forth in [the parties'] integrated written agreement." *1726 Cherry Street Partnership v. Bell Atlantic Properties, Inc.,* 653 A.2d 663, 670 (Pa.Super.1995). If the party does not so insist, it is "barred from eliciting parol evidence that [it was] fraudulently induced into entering the contracts." *Id. See also Bardwell v.*

*Willis Co., Inc.,* 100 A.2d 102, 105 (Pa.1953) ("If plaintiffs relied on any understanding, promises, representations or agreements made prior to ... written agreement['s execution], they should have protected themselves by incorporating [them] in the . .. agreement."). This is true even if the party wishes to use the parol evidence to support a claim for fraudulent or negligent misrepresentation, rather than one for breach of contract. FN7 *See Dayhoff Inc.,* 86 F.3d 1287 at 1299-1301 (fraud claim could not go forward based on representations made before integrated contract executed); *Sunquest Information Systems, Inc. v. Dean Witter Reynolds, Inc.,* No. Civ.A. 98-188J, 1999 WL 167091, at *10, __ F.Supp.2d ___, (W.D.Pa. March 24, 1999) (fraud claim based on omissions, "properly considered, [was] nothing more than an attempted bootstrap around the integration clause," and thus failed); *Regent Nat'l Bank v. Dealers Choice Automotive Planning, Inc.,* No. Civ.A. 96-7930, 1997 WL 786468, at *6 (E. D.Pa. Nov. 26, 1997) (" the parol evidence rule is equally applicable in the context of a claim of fraud," as it is in a claim for breach of contract) (citations omitted); *Glass v. Singer Optical Group, Inc.,* Civ. A. No. 95-308, 1995 WL 717411, at *3 (E.D.Pa. Dec. 1, 1995) (holding that parol evidence rule precluded court from looking at evidence of oral misrepresentations); *HCB Contractors v. Liberty Place Hotel Assoc.,* 652 A.2d 1278, 1279 (Pa.1995) ("[W]here prior fraudulent oral representations are alleged regarding a subject that was specifically dealt with in the written contract, the party alleging such representations must, under the parol evidence rule, also aver that the representations were fraudulently or by accident or mistake omitted from the integrated written contract."); *Bardwell,* 100 A.2d at 105 ("Merely bringing an action in trespass for deceit [rather than] ... for breach of contract will not suffice to circumvent the parol evidence rule."). "Otherwise, the parol evidence rule " 'would become a mockery," ' and integrated contracts could be avoided or modified by claims of differing prior representations." *Dayhoff, Inc.,* 86 F .3d. at 1300 (quotation omitted).

> FN7. Although the cases discuss the parol evidence rule in terms of a claim for fraud,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                     Page 7

Not Reported in F.Supp.2d, 1999 WL 387329
**(Cite as: Not Reported in F.Supp.2d)**

the reasoning is equally applicable to claims for negligent misrepresentation. *See The Cara Corp., v. Continental Bank,* 148 B.R. 760, 771 (E.D. Pa 1992) ("The only ' distinguishing factors' between fraudulent misrepresentation and negligent misrepresentation is that, as to negligent misrepresentation, the state of mind of the actor to intentionally harm the plaintiff need not be proven and the plaintiff must arguably meet a lesser standard of proof.") (citation omitted).

**\*6** Levin alleges (1) that "prior to approving the purchase by [Levin] of the Hamburg distribution rights and entering into the Distribution Agreements, Armstrong knew it intended to terminate [Levin's] distribution rights within the next two years but failed to disclose those intentions to [Levin]," Countercl., at ¶ 64, (2) that Armstrong's failure to disclose its plans to terminate these rights was intentional, *id.* at ¶ 66 , or, at the very least negligent, *id.* at ¶ 73, (3) that Armstrong's failure to disclose these plans was "a material omission by Armstrong in the approval of the purchase by [Levin] of the Hamburg distribution rights and in the execution of the Distribution Agreements," *id.* at ¶ 65, (4) that Armstrong " knew or reasonably should have known that its intention to terminate [Levin's] distribution rights was material to [Levin's] purchase of the Hamburg distribution rights and the execution of the Distribution Agreements," *id.* at ¶ 71, and (5) that as a result of Armstrong's failure to disclose its plans [Levin] has suffered financial harm. *Id.* at ¶¶ 69, 74.

If Levin's understanding that it would be an Armstrong distributor for the foreseeable future was a material factor in both its decision to acquire the Hamburg rights, and its decision to execute the distribution agreements, it should have insisted that this understanding be set forth in the parties' integrated distribution agreements. Levin, however, did not so insist. Thus, because Levin's distribution rights and their duration are the subject matter of these agreements, and because Levin does not allege that Armstrong fraudulently omitted Levin's understanding from the parties' integrated

agreements, the parol evidence rule bars Levin's counterclaims for fraud and negligent misrepresentation.

Accordingly, I shall grant Armstrong's motion to dismiss Levin's counterclaims for fraud and negligent misrepresentation.

### D. Promissory Estoppel (Count V)

Armstrong avers that because Levin has failed to allege an express promise upon which it relied, Levin's claim for promissory estoppel should be dismissed. Levin, however, responds that a promissory estoppel claim can be based upon an implied promise, and thus that Armstrong's motion to dismiss this counterclaim should be denied. FN8

> FN8. In Count V, Levin also brought a counterclaim for "equitable estoppel." However, in its memorandum, Levin " concedes that equitable estoppel is not a separate cause of action." Def.'s Mem. at 25.

The elements of a claim for promissory estoppel are: "(1) a promise to a promisee, (2) which the promisor should reasonably expect will induce action by the promisee, (3) which does induce such action, and (4) which should be enforced to prevent injustice to the promisee." *C & K Petroleum Products, Inc. v. Equibank,* 839 F.2d 188, 192 (3rd Cir.1988) (citations omitted). Promissory estoppel's general purpose is "to prevent the injustice that results when a promisee is reasonably induced by, and relies upon, some promise by a promisor that is broken." *Id.* Because "[p]romissory estoppel would [otherwise] be rendered meaningless," one, to maintain a claim for promissory estoppel, must establish an express promise, and not merely an implied one. *Id.; See also Nabisco Inc., v. Ellison,* No. CIV. A. 94-1722, 1994 WL 622136, at \*7 (E.D.Pa. Nov. 8, 1994) (because Pennsylvania law requires that promissory estoppel be based upon express promise, plaintiff could not maintain claim upon "implied promise it inferred from [defendant's] silence and conduct.")

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 1999 WL 387329
**(Cite as: Not Reported in F.Supp.2d)**

**\*7** In its counterclaim for promissory estoppel, Levin alleges that "[b]y [Armstrong's] actions, words, and/or deeds, and/or the course of dealing and/or performance between [Armstrong] and [it], Armstrong promised [it] that it would remain a distributor for [Armstrong] for the foreseeable future." Countercl. ¶ 76. Levin, however, does not allege that Armstrong made an express promise to it.

Accordingly, I shall grant Armstrong's motion to dismiss Levin's counterclaim for promissory estoppel.

### E. Unjust Enrichment (Count VI)

Armstrong argues that because unjust enrichment is not applicable when the parties' relationship is governed either by a written agreement or an express contract, Levin's counterclaim for unjust enrichment should be dismissed. Levin, however, responds that it is entitled to plead in the alternative, and thus that Armstrong's motion to dismiss its claim for unjust enrichment should be denied.

"Under Pennsylvania law, 'the quasi-contractual doctrine of unjust enrichment is inapplicable when the relationship between the parties is founded on a written agreement or express contract." ' *Hershey Foods Corp. v. Ralph Chapek, Inc.,* 828 F.2d 989, 999 (3rd Cir.1987) (quotation omitted). This is because "[w]here an express contract governs the relationship of the parties, a party's recovery is limited to the measure provided in the express contract; and where the contract 'fixes the value of the services involved,' there can be no recovery under a quantum meruit theory." *Id.* (quotation omitted); *See also Emtec Inc., v. Condor Technology Solutions, Inc.,* No. CIV. A. 97-6652, 1998 WL 834097, at \*2-3 (E.D.Pa. Nov. 30, 1998) (because parties' relationship was based on express, written contract, plaintiff could not amend complaint to add unjust enrichment claim).

Although parties may plead alternative causes of action, neither party alleges, nor argues, that the distribution agreements governing their relationship are unenforceable. Thus, because neither Levin nor Armstrong allege or argue that the agreements are

unenforceable, Levin has failed to state a claim for unjust enrichment.

Accordingly, I shall grant Armstrong's motion to dismiss Levin's counterclaim for unjust enrichment.

### F. Adjustment of Account (Count VII)

Armstrong argues that because Levin has not paid for the products it purchased from it, Levin's claim for adjustment of account is really a defense, and not a counterclaim. Armstrong further argues that because this counterclaim "contains one sentence which includes requests for credits for defective products, to remedy customer issues, and for advertising allowances," it has failed, under Federal Rule of Civil Procedure 8, to state a claim. Pl.'s Mem. at 25. Accordingly, Armstrong avers that Levin's counterclaim for adjustment of account should be dismissed. Levin, however, responds that Armstrong, in arguing that its claim is really a defense, improperly assumes that it allegedly owes Armstrong more than any adjustment it is entitled to. Levin further responds that its single-sentence allegation sufficiently puts Armstrong on notice of the counterclaim's grounds. Accordingly, Levin argues that Armstrong's motion to dismiss its counterclaim for adjustment of account should be denied.

**\*8** "Federal Rule of Civil Procedure 8(a) establishes a 'liberal system of "notice pleading" ' which 'does not require a claimant to set out in detail the facts upon which [it] bases [its] claim.' Greater particularity in pleading is only required for allegations of fraud and mistake." *Shaw v. Dallas Cowboys Football Club, Ltd.,* No. CIV.A. 97-5184, 1998 WL 419765, at \*5 (E.D. Pa. June 23, 1998) (quotations and citation omitted).

In its counterclaim for adjustment of account, Levin alleges that it "is entitled to various credits to its account with Armstrong for items, without limitation, such as advertising allowances, defective products and disputes between Armstrong and its customers for which Armstrong owes [it] money." Countercl. at ¶ 89. At this stage of the case, it is uncertain that any sum Levin may owe Armstrong is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 9

Not Reported in F.Supp.2d, 1999 WL 387329
**(Cite as: Not Reported in F.Supp.2d)**

necessarily greater than the adjustment that Levin
alleges it is entitled to. Further, Levin's
counterclaim adequately puts Armstrong on notice
of both its nature and its basis.

Accordingly, Armstrong's motion to dismiss Levin's
counterclaim for adjustment of account shall be
denied.

An order follows.

### ORDER

AND NOW, this 19th day of May, 1999, it is
ordered that:

1. Plaintiff's Motion to Dismiss Defendant's
Counterclaim is GRANTED as to defendant's
counterclaims for (1) breach of contract (Count I),
(2) breach of the duty of good faith and fair dealing
(Count II), (3) fraud (Count III), (4) negligent
misrepresentation        (Count        IV),        (5)
equitable/promissory estoppel (Count V), and (6)
unjust enrichment (Count VI);

2. Plaintiff's Motion to Dismiss Defendant's
Counterclaim is DENIED as to defendant's
counterclaim for adjustment of account (Count VII).

E.D.Pa.,1999.
Armstrong World Industries, Inc. v. Robert Levin
Carpet Co.
Not Reported in F.Supp.2d, 1999 WL 387329

Briefs and Other Related Documents (Back to top)

• 2:98CV05884 (Docket) (Nov. 06, 1998)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.