1 of 1 DOCUMENT

THOMAS JACOBSEN, Plaintiff, v. J.K. PONTIAC GMC TRUCK, INC.,
Defendant.

No. 01 C 4312

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION

2001 U.S. Dist. LEXIS 20393

December 7, 2001, Decided
December 10, 2001, Docketed

**DISPOSITION:** [*1] Defendant's motions to stay proceedings and compel arbitration (Doc. Nos. 3-1, 3-2, 6-1) granted.

**LexisNexis(R) Headnotes**

**COUNSEL:** For THOMAS JACOBSEN, plaintiff: Christopher V. Langone, Joel D. Dabisch, Mark T. Lavery, Langone Law Firm, Chicago, IL.

For J.K. PONTIAC-GMC TRUCK, INC., defendant: Stuart David Gordon, Anthony Alphonse Cavallo, Zukowski, Rogers, Flood & McArdle, Chicago, IL.

**JUDGES:** REBECCA R. PALLMEYER, United States District Judge.

**OPINIONBY:** REBECCA R. PALLMEYER

**OPINION:**

### MEMORANDUM OPINION AND ORDER

Plaintiff Thomas Jacobsen, customer of an automobile retailer, filed this complaint against the retailer, Defendant J.K. Pontiac-GMC Truck, alleging that Defendant rejected his credit application in violation of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691, and the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 (1998). Defendant now moves to stay the proceedings and compel arbitration according to an arbitration agreement ("the Agreement") that both parties signed at the time

Plaintiff executed an automobile purchase agreement and applied for credit from Defendant.

Plaintiff argues that this court should deny Defendant's motions [*2] because the Agreement was predicated on the unfulfilled condition precedent that a third-party lender approve the car loan. Plaintiff also argues that his claims do not fall within the provisions of the Agreement, and that the Agreement is unenforceable under the Illinois Motor Vehicle Retail Installment Sales Act ("MVRISA"). Finally, Plaintiff argues that the Agreement is unenforceable for lack of consideration. For the reasons set forth below, Defendant's motion to stay proceedings in this court and compel arbitration is granted.

### BACKGROUND n1

> n1 Courts treat motions to compel arbitration as assertions that they are deprived of subject matter jurisdiction during the course of arbitration. *Johnson & Bell, Ltd. v. ASA Legal Sys.*, 2000 U.S. Dist. LEXIS 957, 2000 WL 139473, at *1 (N.D. Ill. Jan. 31, 2000); *Robert Half Int'l, Inc. v. Thompson*, 1999 U.S. Dist. LEXIS 2719, 1999 WL 138849, at *1 (N.D. Ill. Mar. 5, 1999) (citing *Evans v. Hudson Coal Co.*, 165 F.2d 970, 972 (3rd Cir. 1948). Accordingly, the court may consider the facts presented in the parties' pleadings, including attached exhibits. *Johnson & Bell*, 2000 U.S. Dist. LEXIS 957, 2000 WL 139473, at *1; *Robert Half Int'l*, 1999 WL 138849, at *1 (citing *Capitol Leasing Co. v.*

*Federal Deposit Ins. Corp.*, 999 F.2d 188, 191 (7th Cir. 1993) (court may look beyond allegations to submitted evidence when deciding whether jurisdiction exists)). The court accepts uncontested facts as true. *Saylor v. Dyniewski*, 836 F.2d 341, 342 (7th Cir. 1988). Where the facts are in dispute, the court accepts Jacobsen's version. *Turnock v. Cope*, 816 F.2d 332, 333 (7th Cir. 1987).

[*3]

On May 20, 2000, Plaintiff attempted to purchase a used 1992 Pontiac Firebird automobile from Defendant. (J.K. Pontiac Purchase Contract, Ex. A to Plaintiff's Opposition to Def's Motion to Compel Arbitration ("Pl's Opp'n"); Complaint P 6.) In connection with that attempted purchase, Plaintiff signed several documents on that date, including a retail installment contract and two arbitration agreements. n2 (Federal Truth-In-Lending Disclosure Statement, Ex. A to Def.'s Amended Motion to Stay and Compel Arbitration ("Def.'s Amended Motion"); Agreement to Arbitrate Dispute, Ex. B-1 to Def's Amended Motion; Arbitration Agreement, Ex. B-2 to Def's Amended Motion.) On that date Plaintiff also signed a rider to the retail installment contract stating that the loan is "not approved until the loan company funds on the deal," and that such funding "takes anywhere from one week to one month." (J.K. Pontiac Rider, Ex. C to Pl.'s Opp'n.) It is undisputed that Defendant's third-party lender denied financing because Jacobsen was unemployed, despite his representations to the contrary on the credit application. (Def.'s Amended Motion at 1, n.1; Jacobsen Credit Application, Ex. C to Def.'s Amended [*4] Motion; 6/7/00 Memo re "Return of Deal Not Funded", Ex. D to Def.'s Amended Motion.) Therefore, Defendant cancelled the transaction approximately two to three weeks after May 20.

n2 In support of its Amended Motion to Stay and Compel Arbitration, Defendant submitted two arbitration agreements between Plaintiff and Defendant dated May 20, 2000. In response to Plaintiff's contention that the arbitration agreements contradicted each other on several points, Defendant agreed in open court that it would not seek enforcement of the arbitration agreement attached to its motion as Exhibit B-1. (*See* Pl. Reply at 2, n.1.) This court, accordingly, will consider only the second Arbitration Agreement (Ex. B-2 to Amended Motion), which both parties agree is the only arbitration agreement at issue in this motion.

Nearly one year later, Plaintiff filed this suit alleging that Defendant failed to notify him in writing that his financing application had been denied in violation of the ECOA, and that by taking adverse action [*5] against him based upon information in a credit report, Defendant damaged him in violation of the FCRA. Defendant moved to stay the proceedings in this court and compel arbitration according to the Agreement.

## DISCUSSION

### A. Standard of Review

The Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ("FAA"), governs the enforcement, validity, and interpretation of arbitration clauses in commercial contracts in both state and federal courts. *Jain v. Mere*, 51 F.3d 686, 688 (7th Cir. 1995). Under the FAA, arbitration clauses are valid and enforceable agreements to be viewed with favor as a matter of federal and public policy. 9 U.S.C. § 2; *see Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l, Ltd.*, 1 F.3d 639, 641 (7th Cir. 1993) ("it is beyond peradventure that the Federal Arbitration Act embodies a strong federal policy in favor of arbitration"). *See also Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 280, 130 L. Ed. 2d 753, 115 S. Ct. 834 (1995) (noting that Congress had "the needs of consumers . . . in mind" when passing the FAA, and observing that "arbitration's advantages [*6] often would seem helpful to individuals. . . complaining about a product, who need a less expensive alternative to litigation"). The statute therefore directs federal courts to stay legal proceedings when a particular dispute is found to be subject to arbitration under a contract or agreement. 9 U.S.C. § 3. In keeping with the spirit of the FAA, "on order to arbitrate ... should not be denied unless it may be said with positive assurance that the arbitration clause [in a contract or agreement] is not susceptible of an interpretation that covers the asserted dispute." *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 4 L. Ed. 2d 1409, 80 S. Ct. 1347 (1960); *see also AT&T Tech. Inc. v. Communications Workers of Am.*, 475 U.S. 643, 648-50, 89 L. Ed. 2d 648, 106 S. Ct. 1415 (1986).

Despite this strong presumption in favor of their validity, arbitration agreements ultimately remain a matter of the parties' intent. Nothing in the FAA limits the parties' freedom to design arbitration clauses to their own tastes and needs. Therefore, the subject matter of an arbitration clause carries its own substantive and

temporal [*7] terms and limitations. *See, e.g., Bradford-Scott Data Corp. v. Physician Computer Network, Inc.,* 136 F.3d 1156, 1157 (7th Cir. 1998) (arbitration clause limited to disputes concerning payment of license or support fees); *McDonnell Douglas Fin. Corp. v. Pennsylvania Power & Light Co.,* 858 F.2d 825, 831 (2nd Cir. 1988) (arbitration clause limited to tax obligations arising from indemnification under one specific paragraph of contract). In other words, the parties may properly agree to arbitrate some claims but not others. *See, e.g., Kroll v. Doctor's Assocs., Inc.,* 3 F.3d 1167, 1171 (7th Cir. 1993) (fact that parties agreed to arbitrate all disputes relating to franchise agreements but not disputes relating to real estate agreements does not undermine the mutuality of the franchise agreement's arbitration provision); *International Bhd. of Teamsters, Local Union No. 371 v. Logistics Support Group,* 999 F.2d 227, 230 (7th Cir. 1993) (duty to arbitrate remains one prescribed by contract and matters subject to arbitration should be specifically stated). No court may force a party to arbitrate a claim it has not previously [*8] agreed to arbitrate. *AT&T,* 475 U.S. at 649. Nor may a court expand the application of an arbitration clause beyond its intended scope. Instead, a court must resolve any dispute as to the arbitrability of a claim by examining whether it is of the type that the parties agreed to arbitrate. *Id.; see also International Bhd.,* 999 F.2d at 229.

To determine whether an arbitration agreement is valid, a federal court should look to the state law that governs contract formation. *Gibson v. Neighborhood Health Clinics, Inc.,* 121 F.3d 1126, 1130 (7th Cir. 1997). Illinois was the situs of all relevant events in this dispute, so the court must look to Illinois contract law principles. *Id.*

## B. Plaintiff's Claims

### 1. Condition Precedent and Scope of the Agreement

Plaintiff first argues that the arbitration agreement never came into effect because the retail installment contract contained a condition precedent to that agreement--loan approval by a third-party lender--that never occurred. To support this argument, Plaintiff points to language in the retail installment contract rider that states that "the loan is not approved until the [*9] loan company funds on the deal," and language of similar effect in the retail installment contract itself. Plaintiff argues that his case is similar to *Johnson & Bell, Ltd. v. ASA Legal Sys.,* 2000 U.S. Dist. LEXIS 957, 2000 WL 139473 (N.D. Ill., Jan. 31, 2000)

(Conlon, J.). *Johnson & Bell* dealt with a software installation and support contract that the plaintiff purchasers had signed but the defendant sales company had not. *Id.* at **4-5. The district court denied the defendant's motion to compel arbitration because the contract expressly stated that the agreement was enforceable only if signed by both parties. *Id.* at *5. The defendant's signature essentially was a condition precedent to creating an enforceable pact. *Id.*

The court agrees with Defendant that *Johnson & Bell* is readily distinguishable from Plaintiff's case. The arbitration clause in *Johnson & Bell* was a clause within the sales and support agreement at issue in that case. Clearly, if an entire contract is rendered invalid, as it was in *Johnson & Bell,* then any single clause within the agreement is invalid as well. In Plaintiff's case, however, the parties entered into several separate agreements, [*10] including the retail installment contract and the separately enforceable Agreement. The Agreement's separate enforceability is evidenced by its terms, which provide for binding arbitration with regard to any "Dispute," defined as "any controversy or claim arising from or relating to the vehicle [buyer has] purchased"; "claims relating to the negotiation or breach of any purchase order and/or bill of sale relating to the vehicle"; and "any question regarding whether a matter is subject to arbitration under this Arbitration Agreement." n3 (Ex. B-2 to Def.'s Amended Motion.) This language expressly contemplates situations precisely like the one Plaintiff brings before this court: claims arising out of transactions associated with vehicle purchases. The court finds this interpretation, proffered by Defendant, entirely plausible. The court concludes, further, that such an interpretation is fundamentally incompatible with Plaintiff's assertion that actual consummation of a vehicle purchase was a necessary condition to the enforceability of the Agreement.

n3 The exceptions are "a claim relating to the buyer's failure to pay an agreed upon down payment or failure to pay any amount due pursuant to a promissory note executed in lieu of a cash down payment; as to the issuance by buyer, concerning the amount remaining due on any loan concerning a trade-in vehicle; any claim relating to the possession, repossession or replevin of the vehicle; or relating to actions to enforce any Retail Installment Contract executed by [purchaser] in connection with the purchase of the vehicle." Plaintiff does not contend that his allegations fit into any of these exceptions to

the Arbitration Agreement.

[*11]

The court is also unpersuaded by Plaintiff's argument that his claims are beyond the scope of the Agreement. The Seventh Circuit has noted that arbitration provisions incorporating the "arising from or relating to" language are extremely broad and capable of an extensive reach. *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 909 (7th Cir. 1999) (citing *Tracer Research Corp. v. National Envtl. Servs. Co.*, 42 F.3d 1292, 1295 (9th Cir. 1999)). The breadth of such provisions creates a presumption of arbitrability. *Kiefer*, 174 F.3d at 910. *See also J.J. Ryan & Sons v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 321 (4th Cir. 1988) (broad arbitration clause "does not limit arbitration to the literal interpretation or performance of the contract. It embraces every dispute between parties having a significant relationship to the contract regardless of the label attached to the dispute."). The court is unable to conclude that Plaintiff's claims--predicated on alleged omissions in responses to a car financing application--lie beyond the scope of an Agreement signed when Plaintiff tried to buy the car for which [*12] financing was sought.

### 2. Motor Vehicle Retail Installment Sales Act

Plaintiff also argues that the Agreement is unenforceable under § 12 of the Motor Vehicle Retail Installment Sales Act, 815 ILCS 375/12 ("MVRISA"). That statute, in pertinent part, says: "No provision in a retail installment contract relieving the seller from liability for any remedies provided by law which the buyer may have against the seller is enforceable." 815 ILCS 375/12. The court notes that MVRISA regulates installment sales contracts, not arbitration agreements. Plaintiff makes the conclusory argument that the Agreement "by its terms" is part of the retail installment contract that Plaintiff and Defendant executed. (Pl.'s Opp'n, at 6.) The court disagrees with Plaintiff's reading of the Agreement and, for the reasons stated above, believes that the Agreement is independent of the sale contract and separately enforceable. Because MVRISA does not apply to arbitration agreements, it does not vitiate the Agreement in this case.

### 3. Mutuality of Obligation

Finally, Plaintiff argues that the Agreement is void for lack of consideration. Specifically, Plaintiff contends that Defendant made an illusory [*13] promise to seek arbitration because under the Agreement, Defendant is free to pursue litigation over arbitration, while Plaintiff's

sole method of dispute resolution is arbitration. n4 Illinois law regarding mutuality of obligation (essentially the same as the common-law notion of consideration), requires that either both parties be bound, or neither be bound. *Carrico v. Delp*, 141 Ill. App. 3d 684, 687, 490 N.E.2d 972, 974, 95 Ill. Dec. 880 (4th Dist. 1986). Moreover, mutuality of obligation does not require that the promises exchanged on each side be identical or even equal. *Piehl v. Norwegian Old Peoples' Home Soc'y*, 127 Ill. App. 3d 593, 595, 469 N.E.2d 705, 706, 83 Ill. Dec. 98 (1st Dist. 1984).

> n4 See footnote 3 for the list of exceptions for which the Agreement does not require arbitration.

Plaintiff cites a number of cases that he claims support his argument. In *Hull v. Norcom, Inc.*, the Eleventh Circuit refused to enforce an arbitration clause in an employment contract [*14] where both parties in one clause agreed to submit disputes to arbitration, while another clause in the same agreement grants the employer "a unilateral right to a judicial forum 'in the event of [a] breach by [employee].'" 750 F.2d 1547, 1550 (11th Cir. 1985). Plaintiff also cites *Lopez v. Plaza Finance Co.*, in which the district court held that an agreement lacked mutuality where an arbitration clause was contradicted by another clause in the same agreement that said "under no conditions shall any dispute ... [regarding] default ... be subject to arbitration in the manner set forth herein." 1996 U.S. Dist. LEXIS 5566, 1996 WL 210073, at *1 (N.D. Ill., Apr. 25, 1996).

The Seventh Circuit Court of Appeals recently decided a case involving facts relevant to this discussion. In *Penn v. Ryan's Family Steak Houses, Inc.*, the court considered whether an arbitration agreement is illusory if the employer "commits itself only 'to provide an arbitration forum, Rules and Procedures, and a hearing and decision based on any claim or dispute' that the employee might raise." 269 F.3d 753, 759 (7th Cir. 2001). The court held that the employer's promise in that [*15] case was illusory because the agreement did not require the employer to specify any details about the forum or set any standards with which the employer must comply. *Id.* at 759. The employer, the court noted, "could fulfill its promise by providing ... a coin toss." *Id.*

*Hull, Lopez*, and *Penn* teach that an arbitration agreement should not be enforced if by its terms one party has made no promise to arbitrate under any conditions. This rule harmonizes well with the Illinois

common law rule, suggested in *Piehl*, that the exchange of promises must be real, but they need not be equal. *See Piehl*, 127 Ill. App. 3d at 595, 469 N.E.2d at 706.

Ultimately, however, the court concludes that Defendant has bound itself by the terms of the Agreement. Although the language of the Agreement appears to favor Defendant, it does impose obligations on both parties. Defendant is clearly bound, without exception, to submit to arbitration in areas such as claims relating to the "negotiation or breach of any purchase order and/or bill of sale relating to the vehicle, and any dispute relating to any vehicle service contract" purchased simultaneously with the [*16] vehicle or within thirty days of the vehicle purchase. (Ex. B-2 to Amended Motion.) Unlike *Hull* and *Lopez*, moreover, where conflicting contractual provisions undermined the agreements' arbitration clauses, the language of the Agreement in this case is clear, uncontradictory, and straightforward. Nor is the situation here similar to *Penn*, where an employer unsuccessfully tried to enforce

an arbitration agreement as the third-party beneficiary of a contract between an employee and another company. *Penn*, 269 F.3d at 759. Accordingly, the court finds that the Agreement is supported by a mutual exchange of promises, and that the Agreement is valid.

**CONCLUSION**

For the foregoing reasons, Defendant's motions to stay proceedings and compel arbitration (Doc. Nos. 3-1, 3-2, 6-1) are granted. The court accordingly stays this matter and directs the parties to enter into binding arbitration and return for a status report after the conclusion of the arbitration.

ENTER:

Dated: December 7, 2001

REBECCA R. PALLMEYER

United States District Judge

Westlaw.

Not Reported in F.Supp.                                                                    Page 1

Not Reported in F.Supp., 1998 WL 175880
**(Cite as: Not Reported in F.Supp.)**

**C**
Not Reported in F.Supp., 1998 WL 175880
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
H. Lawrence PELEGRIN, Plaintiff,
v.
UNITED STATES FILTER CORPORATION, a
Delaware corporation, Defendant.
**No. CIV.A. 97-390-SLR.**

March 31, 1998.

Joseph M. Bernstein, Esquire, Wilmington, DE,
attorney for plaintiff.
F. Alton Tybout , Esquire, of Tybout, Redfearn, &
Pell , Wilmington, Delaware, and William J.
Anthony , Esquire, and Carla D. Macalusco ,
Esquire, of Jackson, Lewis, Schnitzler & Krupman,
Morristown, NJ, attorneys for defendant.

MEMORANDUM OPINION

ROBINSON , District J.

INTRODUCTION

*1 Pending before the court is a motion filed by
defendant United States Filter Corporation ("USF")
to dismiss the complaint and to compel arbitration.
(D.I.5) Suit was instituted by plaintiff H. Lawrence
Pelegrin under the Age Discrimination in
Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et
seq.,* and the Employee Retirement Income Security
Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.,*
giving this court original jurisdiction over the action
pursuant to 28 U.S.C. § 1331. Plaintiff has alleged
in his complaint that USF violated the provisions of
both the ADEA and ERISA when, in June 1996,
USF eliminated plaintiff's employment and deprived
him of valuable benefits, including certain stock
option benefits. (D.I.1) USF has filed the instant
motion on the ground that plaintiff's lawsuit is

precluded by reason of an Executive Retention
Agreement ("the Agreement") executed by the
parties in April 1995. The Agreement contained
the following arbitration provision:

Other than with respect to the enforcement of
Section 11, including any dispute or controversy
under that Section (a "Section 11 Dispute"), any
dispute or controversy arising under or in
connection with this Agreement or in connection
with any other aspect of the Executive's
employment with the Company, including all
claims by the Executive in connection therewith,
shall be settled exclusively by binding arbitration,
conducted before a panel of three arbitrators in
Delaware, in accordance with the rules of the
American Arbitration Association then in effect.

Each party shall bear their own expenses and
costs in such arbitration and one half of the costs
charged by the arbitrators, except if the Executive
shall prevail in any significant respect in such
dispute or controversy the Company shall pay the
Executive's reasonable legal fees, expenses and
costs incurred in enforcing or defending its rights
hereunder and all of the costs charged by the
arbitrators. In connection with a Section 11
Dispute, the Executive and the Company hereby
submit to the jurisdiction of the federal and/or
state courts, as the case may be, sitting in New
Castle County, Delaware, in connection with any
action arising from or relating to a Section 11
Dispute.

(D.I.8, Ex. A, ¶ 14) Plaintiff asserts in response
that the Agreement is invalid pursuant to the
provisions of the Older Workers Benefit Protection
Act of 1990 ("OWBPA") FN1 codified at 29
U.S.C. § 626(f)(1), and that stay of the proceedings,
not dismissal, would be the appropriate relief even
if some or all of the claims were subject to
arbitration. (D.I.14)

> FN1. The OWBPA, Pub.L. 101-433, tit.
> II, 104 Stat. 978, 983-984 (1990), became
> effective on October 16, 1990 as an

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1998 WL 175880
(Cite as: Not Reported in F.Supp.)

amendment to the ADEA.

## DISCUSSION

For purposes of addressing the instant motion, the court accepts as true the allegations in the complaint. The question raised by the pending motion is one of statutory interpretation, that is, whether a pretermination agreement to arbitrate "all claims" by an employee "arising ... in connection with any ... aspect of the [employee's] employment" applies to an ADEA claim, FN2 in light of the provisions of 29 U.S.C. § 626(f)(1), which provide as follows:

> FN2. Plaintiff concedes that the Agreement "is the type of agreement that is covered by the FAA," the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.,* and that "his ERISA claim is subject to mandatory arbitration under the Agreement." (D.I. 14 at 5 n. 2) *See Great Western Mortgage Corp. v. Peacock,* 110 F.3d 222, 226-227 (3d Cir.1997) ; *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 7 F.3d 1110, 1116 (3d Cir.1993).

**\*2** An individual may not waive any right or claim under this Act unless the waiver is knowing and voluntary. Except as provided in paragraph (2), a waiver may not be considered knowing and voluntary unless at a minimum -
(A) the waiver is part of an agreement between the individual and the employer that is written in a manner calculated to be understood by such individual, or by the average individual eligible to participate;
(B) the waiver specifically refers to rights or claims arising under this Act;
(C) the individual does not waive rights or claims that may arise after the date the waiver is executed;
(D) the individual waives rights or claims only in exchange for consideration in addition to anything of value to which the individual already is entitled;
(E) the individual is advised in writing to consult with an attorney prior to executing the agreement;

(F) (i) the individual is given a period of at least 21 days within which to consider the agreement; or
(ii) if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the individual is given a period of at least 45 days within which to consider the agreement;
(G) the agreement provides that for a period of at least 7 days following the execution of such agreement, the individual may revoke the agreement, and the agreement shall not become effective or enforceable until the revocation period has expired;
(H) if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the employer (at the commencement of the period specified in subparagraph (F)) informs the individual in writing in a manner calculated to be understood by the average individual eligible to participate, as to -
(i) any class, unit, or group of individuals covered by such program, any eligibility factors for such program, and any time limits applicable to such program; and
(ii) the job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program.

As noted above, § 626(f)(1) was added to the ADEA with the passage in 1990 of the OWBPA. The legislative history of the OWBPA indicates that the waiver provisions of title II of the OWBPA were directed to "unfair and abusive waiver practices." H.R.Rep. No. 101-221, at 9 (1989). Specifically,
[t]he Committee's major concern in this regard [was] that early retirees or employees being offered the chance to participate in exit incentive or other group termination programs can effectively be forced to waive their right to file a claim when the employer conditions such participation on the signing of a waiver. The problem is particularly acute in large-scale terminations and layoffs, where an individual employee would not reasonably be expected to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 3

Not Reported in F.Supp., 1998 WL 175880
**(Cite as: Not Reported in F.Supp.)**

know or suspect that age may have played a role in the employer's decision, or that the program may be designed to remove older workers from the labor force. The preemptive waiver of rights occurs before a dispute has arisen and indeed before an employee is even aware of any potential or actual pattern of discrimination. Such a preemptive waiver also may preclude the employee from asserting claims that arise out of subsequent discriminatory conduct by the employer, e.g., hiring younger workers to replace the terminated older workers. These waivers are both unfair and inconsistent with the intent of the ADEA.

*3 *Id.* So far as the court has been able to ascertain, the legislative history nowhere addresses the issue of "waivers" in the context of employment (as opposed to separation) agreements that include arbitration provisions.

Subsequent to the passage of the OWBPA, the United States Supreme Court reviewed the question of whether a claim under the ADEA "can be subjected to compulsory arbitration pursuant to an arbitration agreement in a securities registration application." *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). In answering the question affirmatively, the Court emphasized the importance of the FAA, the provisions of which "manifest a 'liberal federal policy favoring arbitration agreements.' " *Id.* at 25 (quoting *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)). The Court noted as well clear precedent establishing the principle "that statutory claims may be the subject of an arbitration agreement, enforceable pursuant to the FAA." *Id.* at 26. In this regard, the Court explained that,

"[b]y agreement to arbitrate a statutory claim, a party does not forego the substantive rights afforded by statute; it only submits to their resolution in an arbitral, rather than a judicial, forum."

*Id.* (quoting *Mitsubishi Motors Corp. V. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)). Thus,

"[h]aving made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of

judicial remedies for the statutory rights at issue." *Id.* (quoting *Mitsubishi,* 473 U.S. at 628). Having recognized the passage of the OWBPA (*id.* at 28 n. 3), the Court in *Gilmer* observed that "Congress ... did not explicitly preclude arbitration or other nonjudicial resolution of claims, even in its recent amendments to the ADEA." *Id.* at 29 (emphasis added). The Court concluded that the record was insufficient "to show that Congress intended to preclude a waiver of a judicial forum for ADEA claims." *Id.* at 26 (emphasis added). FN3

> FN3. The Court, in its analysis, rejected the argument that cases such as *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) (decided under Title VII of the Civil Rights Act of 1964), and *Barrentine v. Arkansas-Best Freight System, Inc.,* 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981) (decided under the Fair Labor Standards Act, "FLSA"), preclude arbitration of employment discrimination claims. Rather, these cases stand for the narrow proposition that mandatory arbitration under a collective-bargaining agreement did not preclude an individual from subsequently asserting a statutory claim. *See Gilmer,* 500 U.S. at 33-35.

The waiver provisions of the OWBPA were not specifically reviewed by the Supreme Court in *Gilmer.* Significantly, however, the Court found that the "recent amendments to the ADEA" (certainly the waiver provisions of the OWBPA) did not evince a Congressional intention to "preclude arbitration or other nonjudicial resolution of claims.. .." 500 U.S. at 29. That observation, when viewed in combination with the Court's recognition that an agreement to arbitrate a statutory claim constitutes a waiver only of procedural, not substantive, rights ( *id.* at 26), leads inexorably to the conclusion that the arbitration agreement at issue is not violative of § 626(f)(1) and should be enforced.

This conclusion is consistent with Third Circuit precedent. The Third Circuit in *Great Western Mortgage Corp. v. Peacock,* 110 F.3d 222 (3d

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 4

Not Reported in F.Supp., 1998 WL 175880
**(Cite as: Not Reported in F.Supp.)**

Cir.1997), upheld an order to compel arbitration of plaintiff's state discrimination claim, finding that the FAA applies to employment contracts. In its decision, the Court recognized that the FAA preempts only "state laws which 'require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration." ' *Id.* at 230, quoting *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 478, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989). This finding echoes that in *Gilmer,* that arbitration involves a waiver of procedural, not substantive, rights. *Accord, Rice v. Brown Bros. Harriman,* 73 Fair Empl. Proc. Cos. (BNA) 1210 (S.D.N.Y. Mar. 21, 1997); *Williams v. Cigna Financial Advisors, Inc.,* 56 F.3d 656 (5th Cir.1995); *Nieminski v. John Nuveen & Co., Inc.,* No. 96 C 1960, 1997 WL 43252 (N.D.Ill.1997); *Kahalnik v. John Hancock Funds, Inc.,* No. 95 C 3933, 1996 WL 14582 (N.D.Ill.1996).

**\*4** The Third Circuit's decision in *Long v. Sears, Roebuck & Co.,* 105 F.3d 1529 (3d Cir.1997), is not to the contrary. Unlike the circumstances in *Gilmer, Peacock,* and those at bar, which involved employment contracts, plaintiff in *Long* was contesting the enforceability of a "General Release and Waiver" offered to multiple employees in the context of a "reorganization package which included severance benefits." These circumstances mirror those specifically addressed by the waiver provisions of the OWBPA. *Id.* at 1534. Not surprisingly, the Third Circuit found the waiver requirements of the OWBPA to apply.

Having concluded that all of plaintiff's claims (those arising under the ADEA and ERISA) must be submitted to arbitration, the court further concludes that dismissal of the action is appropriate. *See Alford v. Dean Witter Reynolds, Inc.,* 975 F.2d 1161, 1164 (5th Cir.1992) ("Given our ruling that all issues raised in this action are arbitrable and must be submitted to arbitration, retaining jurisdiction and staying the action will serve no purpose" since post-arbitration remedies entail limited judicial review) and the cases cited therein; *EEOC v. Frank's Nursery & Crafts, Inc.,* 966 F.Supp. 500, 505 (E.D.Mich.1997).

## CONCLUSION

For the reasons stated, the court concludes that plaintiff's ADEA claim is arbitrable. Consequently, defendant's motion to dismiss and to compel arbitration shall be granted.

An order shall issue.

D.Del.,1998.
Pelegrin v. U.S. Filter Corp.
Not Reported in F.Supp., 1998 WL 175880

Briefs and Other Related Documents (Back to top)

• 1:97CV00390 (Docket) (Jul. 02, 1997)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                    Page 1

Not Reported in F.Supp.2d, 2004 WL 1739716
**(Cite as: Not Reported in F.Supp.2d)**

Not Reported in F.Supp.2d, 2004 WL 1739716
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Francis V. PULLELLA, Plaintiff,
v.
SUPER FRESH FOOD MARKETS, INC.
Defendant.
**No. Civ.03-711-SLR.**

July 28, 2004.

Francis V. Pullella, Wilmington, Delaware,
Plaintiff, pro se.
Judith M. Kinney , and Thomas J. Francella , of
Reed Smith LLP , Wilmington, Delaware, for
Defendant, Don A. Innamorato, and Sherri A.
Affrunti , of Reed Smith LLP, Princeton, New
Jersey, of counsel.

MEMORANDUM OPINION

ROBINSON, Chief J.

I. INTRODUCTION

*1 On July 14, 2003, plaintiff *pro se* Francis
Pullella filed a complaint alleging claims of sexual
harassment, sex discrimination and retaliation in
violation of Title VII of the Civil Rights Act of
1964, 42 U.S.C. § 2000e-5 , against his former
employer, defendant Super Fresh Food Markets,
Inc. (D.I.1) In a subsequent filing, plaintiff also
alleged discrimination on the basis of disability in
violation of the Americans With Disabilities Act ("
ADA"), 42 U.S.C. § 12101, et seq. (D.I.86) The
court has jurisdiction pursuant to 28 U.S.C. § 1331.
Presently before the court are the parties' cross
motions for summary judgment. (D.I.129, 134) For
the reasons stated below, the court will grant
defendant's motion.

II. BACKGROUND

Plaintiff was hired by defendant on September 17,
2000, as a floating Journeyman Meat Cutter. (D.I.
131, ex. F at 15, 74, 103) As part of his
employment orientation, plaintiff was informed of
defendant's policies pertaining to workplace threats,
violence and sexual harassment. (*Id.* at 116-17, 145;
ex. F; ex. G)

Plaintiff's first assignment was at defendant's
Newark, Delaware location ("Newark Store"),
where he remained through October 2000. (*Id.,* ex.
F at 181) Subsequently, plaintiff was transferred to
defendant's Wilmington, Delaware location ("
Wilmington Store"), where he was employed
through December 23, 2000. (*Id* at 181)

A. Alleged Same-Sex Sexual Harassment

Plaintiff alleges that he was the target of same-sex
sexual harassment by a non-management,
co-employee who worked as a clerk in the
Wilmington Store's deli department and whom
plaintiff perceived to be gay. (*Id.* at 62-63, 172-73;
ex. I at 400) The conduct plaintiff complains of
included sexual statements and suggestive looks.
FN1 (D.I. 131, ex. F at 61, 178-79, 257; ex. I at
404) Plaintiff contends that he repeatedly
complained about this alleged harassment during
November 2000. (*Id.* at 29, 61-62, 182) Plaintiff
asserts that, although his manager intervened and
spoke with the alleged harasser, the conduct did not
stop. (*Id.* at 29, 61-62, 182; D.I. 7 at 7; D.I. 86 at ¶
4-5)

> FN1. In plaintiff's words, the alleged
> harasser looked at him "[t]he way you
> would look at a girl if you hadn't seen one
> in maybe ten years." (D.I. 131, ex. I at
> 404) These statements included: "I like
> your new meat helper;" "I can see why he's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 2

Not Reported in F.Supp.2d, 2004 WL 1739716
**(Cite as: Not Reported in F.Supp.2d)**

in the meat department;" and "I would like to wake up with my head on his chest." (*Id*, ex. F at 61, 178-79, 257)

On at least one occasion, plaintiff engaged in a profanity-laden altercation with the alleged harasser. (D.I. 131, ex. F at 256-58; ex. I at 390-91, 403) In that altercation, plaintiff used offensive, profane and homophobic epithets toward that employee. FN2 (*Id.*, ex. F at 255-56; ex. I at 405-06) Following this altercation, plaintiff took a sick leave for the remainder of that work day. (*Id.* at 255-56)

> FN2. Plaintiff admits a disdain for persons that he perceives to be homosexual because of their alleged "unclean, unhealthy lifestyle" which he finds " offensive." (*Id.*, ex. I. at 390-91; D.I. 135 at 3) Plaintiff states that his co-employee was "lucky [he] didn't punch his face in ... or break his neck" which, plaintiff says, he would have done but for concern about " what kind of diseases" the employee might have. (*Id.* at 390-92) Plaintiff asserts that same-sex sexual harassment is a "common problem for men who are good looking." ( *Id.*)

Defendant's deli manager confronted plaintiff regarding the altercation and requested that plaintiff apologize for his behavior. (*Id.* at 246-437, 254; ex. I at 330; D.I. 7 at ¶ 7) In response, plaintiff told the deli manager that she should not "stick her nose in someone else's business." (*Id.*, ex. F at 246-47, 253-54; D.I. 7 at ¶ 7)

Plaintiff alleges that prior to the altercation, he attempted to contact defendant's toll-free number to lodge a complaint regarding the alleged work place harassment but "was never able to get an answer on that toll free line." FN3 (D.I. 135 at 3) Plaintiff also asserts that he complained to the deli manager at the Wilmington Store but was allegedly told that " Management was not interested in correcting the situation." (*Id.*) Plaintiff also claims that he spoke on several occasions with the assistant store manager but that nothing was done. The events of

November and December 2000 conduct are the sole basis of plaintiff's sexual harassment claims. FN4 ( *Id.*, ex. F at 210-11)

> FN3. Plaintiff alleges in his answer to defendant's summary judgment motion that he contacted defendant through its toll-free number with respect to the sexual harassment. (D.I. 135 at 3) In his deposition, however, plaintiff alleges that he called the toll-free number in April 2002 in regards to being transferred from defendant's News Castle location ("New Castle Store"), not with respect to any sexual harassment that had occurred. (D.I. 132, ex. J at 421)

> FN4. The male deli clerk was not the only employee of defendant's to express interest in plaintiff. Plaintiff alleges that a female employee also made sexual advances, including rubbing her body up against his. (D.I. 131, ex. F at 287) Apparently this behavior was not objectionable, as plaintiff did not file a complaint.

B. Intrigue in the Meat Department

**\*2** Between November and December 2000, while at the Wilmington Store, plaintiff was supervised by Meat Manager Allan Dubolino. (*Id.* at 63) Plaintiff contends that prior to December 2000, defendant's regional area manager asked him to fabricate derogatory reports about Dubolino's work performance to assist the regional area manager in his effort to terminate Dubolino. (*Id.* at 66-67; D.I. 7 at ¶ 7) Plaintiff alleges that when he refused to comply with this demand, he was told that he could be "jeopardizing [his] career." (D.I. 131, ex. F at 66-67; D.I. 7 at ¶ 7) Plaintiff refused to participate in this ruse. In December 2000, Dubolino was discharged by defendant.

Plaintiff does not know why the regional area manager or defendant allegedly wanted Dubolino fired nor the reason why Dubolino was discharged in December 2000. (D.I. 131, ex. F at 65, 67) Plaintiff does not believe that this incident was

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 3

Not Reported in F.Supp.2d, 2004 WL 1739716
**(Cite as: Not Reported in F.Supp.2d)**

related to plaintiff's complaint's of alleged sexual harassment, although it occurred during the same time period. (*Id.* at 64-65)

### C. December 2000 Layoff

Following Dubolino's termination, a new supervisor was assigned to the meat department at the Wilmington Store. (*Id.* at 63-64) Plaintiff believed that the new supervisor felt threatened by plaintiff because the supervisor himself was not a meat cutter. (D.I. 7 at ¶ 7) Plaintiff alleges that his new supervisor told him on December 23, 2000, that he would find a reason to terminate plaintiff because the supervisor believed that plaintiff had been involved in a plot to discharge Dubolino. (*Id.* at 29, 63-65)

Plaintiff contends he complained of the supervisor's alleged threat to the Wilmington Store manager. Immediately after reporting this threat to the store manager, a meeting was held with the store manager, the regional area manager and another employee. At that meeting, plaintiff was told that he would be laid off because he was not a union member and was escorted from the store. FN5 (*Id.* at 60-61, 63-64, 65, 183-84)

> FN5. Apparently both parties were mistaken in December 2000 regarding plaintiff's union status. Plaintiff states that when asked in December 2000 whether he was "in the Union," he indicated to management that he did not know. (D.I. 135 at 4) Plaintiff also asserts that it was " the responsibility of Management to know whether or not Plaintiff was a Union member." (*Id.*) Plaintiff asserts that, as a union member, he could not be laid off during midweek and should have received a week's notice. (D.I. 135, ex. F at 154)

According to plaintiff, he was laid off as of December 23, 2000. Plaintiff alleges that his lay off was retaliatory because he had: (1) complained about Malone's threat; (2) refused to lie about Dubolino; and (3) previously complained of

workplace sexual harassment. (*Id.* at 27-29, 60-61, 74-75) Defendant contends that the lay off was consistent with normal practices following the holiday season slowdown.

### D. Defendant Rehires Plaintiff

In January 2001, defendant rehired plaintiff and he was assigned as a floating meat cutter to defendant's stores in the Philadelphia area. (*Id.* at 176, 184) Although he had a longer commute, plaintiff was retained in January 2001 at the same wage rate, benefits and hours as prior to his layoff. (*Id.* at 184-85) By assigning plaintiff to a floating schedule, plaintiff alleges that this constituted a demotion. FN6

> FN6. In plaintiff's briefs it is unclear whether he contends that this was retaliatory for his complaining of sexual harassment or whether it was discriminatory in that defendant did not handle plaintiff's complaint of sexual harassment in a similar manner as it would have handled a complaint filed by a woman. (D.I. 135 at 4)

In May 2001, plaintiff was transferred to defendant's Pennsville, New Jersey location (" Pennsville Store"), where he worked until early August 2001. (*Id.* at 184; ex. I at 361) Plaintiff does not allege any adverse employment actions occurred during the period between his rehire in January 2001 and August 2001. (*Id.,* ex. F at 208-11)

### E. Harassment Charges Against Plaintiff

**\*3** In August 2001, an employee in the produce department at the Pennsville Store filed a harassment complaint against plaintiff. (D.I. 132, ex. L; *id.,* ex. K at 854-55; D.I. 131, ex. F at 187-88) The complaint alleged both unwanted sexual advances and inappropriate physical contact by plaintiff. (D.I.132, ex. L) Plaintiff denied the claims of harassment and alleged that the complainant had made sexual advances toward him.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 4

Not Reported in F.Supp.2d, 2004 WL 1739716
**(Cite as: Not Reported in F.Supp.2d)**

(D.I. 131, ex. F at 286-88; D.I. 132, ex. K at 856-65)

A second employee of defendant's filed a written complaint regarding alleged sexually harassing conduct by plaintiff directed toward her while plaintiff worked at the Pennsville Store. (D.I. 132, ex. M; D.I. 131, ex. F at 188-89) This second complainant's allegations were supported by statements by another employee. (D.I.132, ex. N) According to her statement, plaintiff made sexually derogatory statements toward her and her then boyfriend. Although plaintiff denies that he harassed this second complainant, he admits that they had a conversation about her boyfriend's age and hair color. (D.I. 131, ex. F. at 188-89, 196) Plaintiff apologized to this second complainant for his behavior, although he denies being contrite. FN7 (*Id.* at 189-90; D.I. 132, ex. K at 877-78) Plaintiff maintains that both charges of sexual harassment against him were either withdrawn or proven false. FN8 (D.I. 135 at 5)

> FN7. During his deposition, plaintiff first denied knowing that the second complaint was filed. (D.I. 135, ex. F at 188) He quickly changed his testimony and indicated that he learned about the second complaint after he filed suit. (*Id.*) Plaintiff then indicated that he had, in fact, been aware of the complaint but that it was illegitimate. (*Id.* at 189)

> FN8. The basis for plaintiff's belief are statements allegedly made to him by a union representative. (D.I. 131, ex. F at 198-99, 201)

Following receipt of the two written complaints and supporting witness statement, defendant's regional area manager contacted plaintiff at home and suspended him for two days; later, plaintiff was demoted. (D.I. 131, ex. F at 197, 228; D.I. 132, ex. K at 854-56) Plaintiff contends that his suspension and demotion were either the result of retaliation for plaintiff's refusal to lie about Dubolino or due to the regional area manager's favoritism for one of the complainants. FN9 (D.I. 131, ex. F at 197-98, 231, 233, 235; ex. I at 352) Plaintiff also contends that

this demotion constitutes sex discrimination and retaliation. (D.I.132, ex. O)

> FN9. The court notes that plaintiff argues that he "has not alleged nepotism." (D.I. 135 at 11) This is directly contrary to statements made in his deposition. (D.I. 131, ex. I at 352)

### F. Plaintiff's First Charge of Discrimination

On August 30, 2001, plaintiff filed charges of discrimination, sexual harassment and retaliation with both the Delaware Department of Labor ("DDOL") and the Equal Opportunity Employment Commission ("EEOC") (the "First Charge"). (*Id.* at 163-66; D.I. 132, ex. O) In the First Charge, plaintiff describes the sexual harassment, the retaliatory layoff in December 2000, the rehire and transfer in January 2001, the demotion and suspension in August 2001, and the alleged threats he received from management in November and December 2000. (D.I.132, ex. O) Plaintiff asserts that he detailed every form of discrimination, harassment and retaliation that he perceived he experienced between his hiring in September 17, 2000 and the date of the First Charge, August 30, 2001. (D.I. 131, ex. F at 203-04)

Nearly nine months later, on May 14, 2002, plaintiff requested in writing that DDOL transfer his case to the EEOC so that he could obtain a right to sue letter. (D.I. 132, ex. P; D.I. 131, ex. F at 213-15) On May 31, 2002, the DDOL administratively closed its file on the First Charge in accordance with plaintiff's request. (D.I.132, ex. Q) On June 25, 2002, the EEOC also closed its file and issued plaintiff a right to sue letter. (*Id.*, ex. R) Plaintiff received that letter on or about June 25, 2002. (D.I. 131, ex. F at 217-18) Plaintiff admits to knowing that he had ninety days to file suit in federal or state court, which expired on September 24, 2002. (*Id.*) Plaintiff states that he "made a conscious choice not to exercise his 'right to sue.' " (D.I. 135 at 6)

### G. Work-Related Injury and Suspension

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 1739716
**(Cite as: Not Reported in F.Supp.2d)**

Page 5

**\*4** Plaintiff alleges that in or about August or September 2001, he sustained a work-related injury and left work at the Pennsville Store. (D.I. 131, ex. I at 355, 358; D.I. 7 at ¶ 11; D.I. 86 at ¶ 10) Plaintiff contends that he received a telephone call from defendant's regional area manager suspending plaintiff based upon defendant's position that plaintiff had left work without proper notice and the regional area manager's belief that a workers' compensation claim should not have been filed. (D.I. 132, ex. I at 355-56; D.I. 7 at ¶ 12) Plaintiff also contends that the manager's decision was influenced by plaintiff's December 2000 refusal to lie about Dubolino. (D.I. 131, ex. F at 236-37) Plaintiff subsequently filed a union grievance; the company agreed, without admitting liability, to pay plaintiff for one of the three days of his suspension. (D.I. 131, ex. I at 356-58)

In April 2002, following the conclusion of a workers' compensation leave and a period of light duty, plaintiff resumed full work and was assigned to defendant's New Castle Store. (*Id.* at 406-07) While working at the New Castle Store, plaintiff encountered the employee who he had previously accused of harassment; the two men exchanged brief and polite salutations. Following this exchange, plaintiff states he was transferred from the New Castle Store based upon an alleged complaint made by that employee. (*Id.* at 407-08) Plaintiff does not know the substance of this alleged complaint nor who made the decision to transfer him. (*Id.* at 408-10; D.I. 132, ex. J at 419) There is no evidence that a formal complaint was actually ever filed against plaintiff. Plaintiff also does not allege he experienced any sexual harassment on that day. (D.I. 131, ex. F at 177; D.I. 132, ex. J at 417, 421)

Plaintiff was transferred to the Newark Store in early May 2002. (D.I. 131, ex. I at 320-21; D.I. 132, ex. J at 419) Plaintiff's wages, benefits and hours remained unchanged following his transfer, and his commuting distance was substantially the same. (D.I. 132, ex. J at 417-20)

### H. Plaintiff's Wage Claim

In early May 2002, following his arrival at the Newark Store, plaintiff discovered that his paychecks had been misdirected to one of defendant's Philadelphia stores. Plaintiff became aware that his paycheck was missing on the Thursday prior to payday. He approached the bookkeepers regarding the location of his paycheck and they offered to assist him in locating it. Plaintiff, agitated by the absence of his paycheck, refused their offer and threatened to call the DDOL. (D.I. 131, ex. F at 93-93; ex. I at 364, 376-66; D.I. 132, ex. K at 663-65, 673-75, 668-72)

Later that same day, plaintiff telephoned the Newark Store in hopes that someone would be there who could authorize a pay advance that night. (D.I. 132, ex. K at 676) Plaintiff reached a manager at that store and allegedly screamed at her regarding his missing paycheck. FN10 (*Id.,* ex. S)

> FN10. Plaintiff contends that it was, in fact, defendant's employees who were yelling and using foul language. (D.I. 135 at 8)

**\*5** The following day plaintiff approached the store manager at the Newark Store and requested a pay advance. Plaintiff asserts that he was denied a pay advance until his union, acting on his behalf, contacted the store manager. (D.I. 131, ex. I at 364; D.I. 132, ex. K at 678-79) Plaintiff received an advance of two-thirds his normal net pay later that day. (D.I. 131, ex. I at 378; D.I. 132, ex. K at 677) Although plaintiff asserts that his paycheck was misdirected to "harass" him, but admits that an administrative problem was also a likely cause. FN11 (D.I. 131, ex. I at 369, 373)

> FN11. Over the course of his employment with defendant, plaintiff alleges that his paycheck was misdirected on approximately five occasions. (D.I. 131, ex. F at 97)

On May 30, 2002, plaintiff filed a complaint alleging that he was underpaid by \$150 (the "Wage Claim"). FN12 (*Id.* at 362-66, 368-69; D.I. 132, ex.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 6

Not Reported in F.Supp.2d, 2004 WL 1739716
**(Cite as: Not Reported in F.Supp.2d)**

W; D.I. 86, ex. 12) The Wage Claim asserted that
for the week of May 12, 2002 through May 18,
2002, he received $150 less than he had actually
earned. (D.I.132, ex. W) Plaintiff stated that his
reason for filing the Wage Claim was to "fix [the
store manager's] little red wagon." (D.I. 131, ex. I at
365-66) Following the filing of his Wage Claim,
plaintiff was instructed by the Newark Store
manager to bring all future paycheck related
problems to him directly. (*Id.* at 37-78; D.I. 132,
ex. J at 498-99) Plaintiff received the missing $150
a week after it should have been paid. (*Id.*, ex. I at
369)

> FN12. Plaintiff alleges that he did not
> received the correct amount in his
> paycheck on approximately five to seven
> occasions over the course of his
> employment. (D.I. 131, ex. F at 96; D.I.
> 132, ex. J at 491)

I. Plaintiff's Suspension

On June 13, 2002, plaintiff received his paycheck
for the week including June 2, 2002. (D.I. 132, ex. J
at 547) Upon review of the check, plaintiff
incorrectly believed that the paycheck was for less
than the appropriate amount, as it did not include
pay for June 2. FN13 (*Id.* at 547-49)

> FN13. Plaintiff latter admitted that his
> belief was in error as he did not actually
> work on June 2. (*Id.* at 547-49)

On June 14, 2002, plaintiff arrived for work at the
Newark Store and approached the Newark Store
bookkeeper. She was working at the customer
service area in the front portion of the store, along
with another employee. (D.I. 132, ex. J at 511-13;
552-554; ex. X at ¶ 3; ex. Y at ¶ 3) Plaintiff,
agitated about his paycheck, demanded to know
who was responsible for his missing pay. (*Id.*, ex.
X at ¶ 3; ex. Y at ¶ 3) The bookkeeper retrieved
the time sheets and reported that the time sheets
indicated that he had not worked on June 2, 2002. (
*Id.*, ex. X at ¶ 4; ex. Y at ¶ 4; ex. K at 658-59)
Plaintiff became irate and, with a foul tongue,

accused the bookkeeper of falsifying the time
sheets. (*Id.*, ex. X at ¶ 5; ex. Y at ¶ 6; ex. Z at ¶
3) Plaintiff's yelling continued and he threatened
various legal actions against defendant and its
employees . FN14 (D.I. 132, ex. X at ¶ 6; ex. Y at
¶ 6; ex. J at 556, 564-66; D.I. 131, ex. F at 35-37;
*Id.*, ex. J at 503, 564-65) Plaintiff's outburst and
profane language were observed by more than one
employee and in the presence and view of
defendant's customers. (D.I. 132, ex. X at ¶ 6; ex.
Y at ¶ 6; ex. BB at ¶ 5)

> FN14. Plaintiff asserts that he spoke in a
> loud voice because the bookkeeper was an
> "old lady," his hearing loss from his guitar
> playing, and that she was behind plexiglass
> during the conversation. (D.I. 132, ex. J at
> 564-566)

Shortly thereafter, the store manager arrived and
was advised by two employees of plaintiff's
behavior. (D.I. 132, ex. T at ¶ 8-11) The store
manager confronted plaintiff regarding this conduct,
the fact that the records indicated that he had not
been scheduled for work on June 2, and that
plaintiff has been directed to bring any paycheck
concerns directly to him, the store manager. (D.I.
132, ex. T at ¶ 12; ex. AA at 8-10) Plaintiff began
yelling at the store manager and screamed that he
was "messing with the wrong cowboy." (*Id.*, ex. T
at ¶ 12; ex. AA at ¶ 10) The store manager then
informed plaintiff that he was suspended pending
further notice. (*Id.*, ex. T at ¶ 13; ex. J at 584-85;
D.I. 131, ex. F at 35-36) As plaintiff left the store,
he continued to yell profanities and indicated that
he was fighting off the urge to strike the store
manager. (D.I. 132, ex. J at 586, 590; ex. K at
620-21; ex. T at ¶ 15; ex. AA at ¶ 11; ex. Y at ¶
9; ex. BB at ¶ 6)

**\*6** Following plaintiff's departure, the store
manager immediately telephoned defendant's human
resources manager. (D.I. 132, ex. T at ¶ 16; ex. CC
at ¶ 3) The human resources manager directed the
store manager to have each employee write down
their recollections of the events that day that
transpired between plaintiff and defendant's
employees at the Newark Store. (*Id.*, ex. T at 17-18;

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 7

Not Reported in F.Supp.2d, 2004 WL 1739716
**(Cite as: Not Reported in F.Supp.2d)**

ex. CC at 4; ex. X at ¶ 11; ex. Y ¶¶ 10-11; ex. Z at ¶ 5; ex. BB at ¶ 7; ex. AA at ¶ 12) After collecting the employee statements, the store manager forwarded them to the human resources manager for review. (*Id.,* ex. T at ¶ 18-19; ex. CC at ¶ 4)

### J. Union Grievance Meeting

Plaintiff's union filed a grievance over his suspension. (*Id.,* ex. CC at ¶ 5) Consistent with the collective bargaining agreement, a grievance meeting was held on July 3, 2002, to discuss plaintiff's suspension. (*Id.* at ¶ 6; ex. T at ¶ 19; ex. J at 595-96) Defendant's store manager, human resources manager, plaintiff and a union representative attended the meeting. Plaintiff denied yelling or engaging in the conduct described by multiple witnesses. (*Id.,* ex. CC at ¶ 8; ex. T at ¶ ¶ 20-22; ex. J at 596-98) Plaintiff accused the store manager of smelling of whiskey, yelling at him and holding a grudge against plaintiff because plaintiff had worked with the store manager's wife at the Wilmington Store. (D.I.132, ex. EE) At the conclusion of the meeting, the human resources manager stated that, consistent with defendant's policies, he would be conducting an investigation into the June 14, 2002 incident.

Following the completion of his investigation, the human resources manager determined that plaintiff had violated defendant's policies against threats in the workplace and had engaged in blatant insubordination. (D.I. CC at ¶ 11) For those stated reasons, the human resources manager, on defendant's behalf, terminated plaintiff's employment. (*Id.* at ¶ 12-15) Plaintiff was advised by letter on July 26, 2002 of the decision and that his suspension had been converted to a discharge effective that date. (D.I.132, ex. CC)

### K. Plaintiff's Second Charge of Discrimination

Following his termination, plaintiff filed a second charge of discrimination with the DDOL and EEOC on August 26, 2002 ("Second Charge"). (D.I. 131, ex. F at 242-44; D.I. 132, ex. HH) Plaintiff agrees

that the Second Charge raises claims only pertaining to his 2002 suspension and termination and that the Title VII basis for his claims were sex and retaliation. (D.I. 131, ex. F at 244-45; D.I. 132, ex. HH) Specifically, plaintiff alleges that his suspension was the result of having "gotten smart" with the store manager's wife, retaliation for filing the Wage Claim, refusing to lie about Dubolino, and in retaliation for his previously filing the First Charge. (D.I. 131, ex. F at 244-45, 247-49; ex. I at 324-25; D.I. 132, ex. HH)

**\*7** The DDOL dismissed plaintiff's Second Charge on February 28, 2003, based upon a finding of no reasonable cause to believe that Delaware law had been violated. (D.I. 132, ex. II; ex. J at 447-48) On April 17, 2003, the EEOC adopted the DDOL's findings and issued plaintiff a right to sue letter that same day. (D.I.132, ex. JJ) Plaintiff filed the present complaint on July 14, 2003. (D.I.1)

### L. Plaintiff's Claim of Disability

Several months after filing the complaint in the present action, plaintiff filed a pleading titled " Opening Statement." (D.I.86) In this self-styled " Opening Statement," plaintiff alleged for the first time that he is disabled and that defendant's actions constituted discrimination and harassment within the meaning of the Americans With Disabilities Act, 42 U.S.C. 12101 et seq ("ADA"). Plaintiff alleges that he suffers from post traumatic stress disorder which, he claims, was "caused by a previous employer." FN15 (D.I. 86 at 2, 5)

> FN15. The court notes that the record does not reflect whether plaintiff has ever actually been diagnosed with any mental health disorder, although plaintiff offered to stipulate to this condition. It would, of course, be plaintiff's burden to prove that he is a covered individual under the ADA.

The event which plaintiff alleges resulted in this disorder are disclosed in a Social Security Disability report dated March 3, 2003. (D.I.132, ex. GG) Plaintiff states that while working at another

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 8

Not Reported in F.Supp.2d, 2004 WL 1739716
**(Cite as: Not Reported in F.Supp.2d)**

grocery store, he was harassed by a "homosexual, substance abusing meat cutter." (*Id.* at A-447) Plaintiff also stated that this employee would call plaintiff's name in a "sexual manner" and tried to " get [plaintiff] alone." (*Id.*) Further states that this co-employee threatened him with knives, after which plaintiff sought legal and medical assistance. ( *Id.*)

Plaintiff alleges that defendant was made aware of plaintiff's purported disability in November 2000 when he first complained of sexual harassment. (D.I. 86 at 2) Plaintiff contends that he told the Wilmington Store assistant manager that he had post traumatic stress disorder and that he had sued his previous employer in regards to his alleged disorder. (*Id.*)

## III. STANDARD FOR SUMMARY JUDGMENT

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10 (1986). "Facts that could alter the outcome are 'material,' and disputes are ' genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.,* 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with ' specific facts showing that there is a genuine issue for trial." ' *Matsushita,* 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a

motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

**\*8** With respect to summary judgment in discrimination cases, the court's role is "to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." *Revis v. Slocomb Indus.,* 814 F.Supp. 1209, 1215 (D.Del.1993) (*quoting Hankins v. Temple Univ.,* 829 F.2d 437, 440 (3d Cir.1987)).

## IV. DISCUSSION

### A. Plaintiff's ADA Claims

In his motion for summary judgment, plaintiff alleges discrimination on the basis of sex and disability, sexual harassment, and retaliation in violation of Title VII. It is undisputed that plaintiff did not raise any claims arising under the ADA until January 8, 2004. (D.I.86) Plaintiff did not allege in either of his charges with the EEOC or DDOL that he suspected that any of the alleged wrongful conduct by defendant arose from an actual or perceived disability. Although the court exercised its discretion to construe plaintiff's pleading as a supplement to his original complaint, in doing so, the court did not address the merits of whether plaintiff's ADA claims satisfied the statutory prerequisites for bringing suit; as the record plainly shows, plaintiff cannot meet this burden. (D.I.92)

Title VII requires that, before bringing suit in federal or state court, a plaintiff must exhaust his administrative remedies. 42 U.S.C. § 2000e-5(e)(1).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 9

Not Reported in F.Supp.2d, 2004 WL 1739716
**(Cite as: Not Reported in F.Supp.2d)**

In the present case, the record is unequivocal that plaintiff never raised his claims of discrimination on the basis of disability with the EEOC or DDOL. Neither the First Charge nor the Second Charge make even a scant reference to disability, actual or perceived, as a factor in any of defendant's alleged misconduct. Consequently, to the extent plaintiff's claims are brought under the ADA, they are barred and defendant is entitled to summary judgment.

### B. Statute of Limitations

42 U.S.C. § 2000e-5(f)(1) requires that a plaintiff bring suit under Title VII within ninety days of receiving a right to sue letter from the EEOC. The ninety day limit operates as a statute of limitations and is strictly construed. *Irwin v. Department of Veteran Affairs,* 498 U.S. 89, 94-95 (1990). In the present case, there is no dispute that plaintiff's First Charge is well outside the time limit imposed by law. Moreover, plaintiff admits that he made the " conscious decision" to not bring suit with respect to those claims described in his First Charge because " it was more important that [he] retain his employment with Defendant." FN16 (D .I. 135 at 6) He contends, however, that he should be permitted to pursue claims stemming from those facts based upon a continuing violation theory.

> FN16. The court notes that the timing of plaintiff's decision is irreconcilable with his own explanation. He received the EEOC right to sue letter on or about June 25, 2002, two weeks after having been suspended, ultimately his last. A little more than a week after receiving the EEOC letter, plaintiff attended the union grievance meeting on July 3, 2002. A month after receiving the EEOC letter, on July 26, 2002, plaintiff was notified by defendant that he was being permanently discharged for the events that occurred on June 14, 2002. Having just been fired by defendant, plaintiff's contention that he decided to not pursue his right to sue on the First Charge is not only unlikely, it is implausible.

The continuing violation theory permits a plaintiff to "pursue a Title VII claim for discriminatory conduct that began prior to the filing period if he can demonstrate that the act is part of an ongoing practice or pattern of discrimination of the defendant." *West v. Philadelphia Elec. Co.,* 45 F.3d 744, 754 (3d Cir.1995). This theory requires proof of two things: (1) that at least one prohibited act occurred during the filing period; and (2) the harassment is not an isolated or sporadic occurrence but part of a persistent, on-going pattern. *See id.* at 754 -755. The continuing violation theory does not apply to discrete acts of discrimination, such as adverse employment acts. *See National Railroad Passenger Corp. V. Morgan,* 536 U.S. 101, 114 (2002). A plaintiff can only rely upon the continuing violation theory for claims predicated upon a hostile work environment. *Id.* at 122.

**\*9** To the extent plaintiff alleges a hostile work environment based upon his sex, his claim is nonetheless time barred. All of the events pertaining to plaintiff's hostile work environment, namely, that he was subjected to sexual harassment, occurred in November and December 2000. Plaintiff has alleged the occurrence of no conduct after December 2000 upon which a hostile work environment claim might rest. Consequently, to the extent plaintiff seeks to recover based upon conduct complained of in his First Charge, his claims are barred by the statute of limitations.

### C. Title VII Sex Discrimination Claims

Discrimination claims under Title VII are analyzed under the framework set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). Plaintiff at bar must first establish a prima facie case of discrimination by proving that: (1) he is a member of a protected class; (2) he is qualified for his position; (3) he suffered an adverse employment action; and (4) either that (a) non-members of the protected class were treated more favorably than the plaintiff, or (b) the circumstances of the plaintiff's termination give rise to an inference of discrimination. *Id.* at 802.

Once a prima facie case is established, the burden

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 11 of 12

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 1739716
**(Cite as: Not Reported in F.Supp.2d)**

Page 10

of production shifts to the defendant (the former employer) to produce a legitimate nondiscriminatory reason for the adverse employment action taken against the plaintiff. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). Because the burden of persuasion does not shift at this stage, the defendant's legitimate nondiscriminatory reason is not evaluated insofar as its credibility is concerned. *Id.*

Once a legitimate nondiscriminatory reason is proffered, the presumption of discrimination created by the prima facie case disappears. *Id.* At this point, the plaintiff must proffer sufficient evidence for the factfinder to conclude by a preponderance of the evidence that the legitimate nondiscriminatory reasons offered by the defendant were not true, but were a pretext for unlawful discrimination. "That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence." ' *Id.* In this regard, the prima facie case and the inferences drawn therefrom may be considered at the pretext stage, as the Supreme Court has explained that "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Id.* at 147. Nevertheless, the ultimate question remains whether the employer intentionally discriminated. "[P]roof that 'the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason ... is correct." ' *Id.* at 147 (quoting *St. Mary's Honor Center v.. Hicks*, 509 U.S. 502, 524 (1993)). "In other words, '[i]t is not enough ... to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." ' *Id.* (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. at 519).

**\*10** Plaintiff has failed to establish a prima facie case of discrimination under Title VII. Plaintiff alleges discrimination on the basis of his sex. Plaintiff, however, is not a member of a protected class, nor has he shown that any similarly situated female employees received more favorable treatment with respect to any of the adverse

employment actions. He, therefore, has not met his initial evidentiary burden of production. *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981) ("The phrase 'prima facie case' not only may denote the establishment of a legally mandatory, rebuttable presumption, but also may be used by courts to describe the plaintiff's burden of producing enough evidence to permit the trier of fact to infer the fact at issue."). Plaintiff contends that a female employee was not disciplined for raising questions concerning her paycheck; he has put forward no supporting affidavits, depositions or other competent evidence to support this claim. Ultimately, it is plaintiff's burden to show a prima facie case, including the production of admissible evidence to support his claims; he has not done so. Consequently, defendant is entitled to summary judgment as to plaintiff's claims of discrimination on the basis of sex.

### B. Title VII Retaliation Claims

Plaintiff's final claim is that his suspension and termination were in retaliation for engaging in protected activity. To establish a prima facie case of retaliation under Title VII, a plaintiff must establish that: (1) he engaged in protected activity; (2) defendant took adverse employment action against him; and (3) a causal link exists between the adverse employment action taken by defendant and the protected activity engaged in by plaintiff. 42 U.S.C. § 2000e-3 (2004) ; *Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 177 (3d Cir.1997) . Whether a particular action "constitutes retaliation depends on what a person in the plaintiff's position would reasonably understand." *Dilenno v. Goodwill Industries of Mid-Eastern Pennsylvania*, 162 F.3d 235, 236 (3d Cir.1998).

Plaintiff alleges four basis for his retaliation claim: (1) filing the First Charge with the EEOC in August 2001; (2) filing the Wage Claim with the DDOL in May 2002; (3) being "smart" with a store manager's spouse; and (4) refusing to lie about his former supervisor. With respect to the latter three bases, none of these are "protected activities" within the meaning of 42 U.S.C. § 2000e-2. Section 2000e-2 only prohibits discrimination for engaging in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 1739716
**(Cite as: Not Reported in F.Supp.2d)**

Page 11

activities related to Title VII. Consequently, even if plaintiff were terminated for being rude to a store manager's spouse two years earlier, refusing to participate in an alleged scheme to fire another employee or filing a wage claim with the DDOL, such activities are not protected by Title VII.

Plaintiff's remaining theory is that his termination was the result of his having previously filed a claim with the EEOC. Defendant contends that the First Charge lacks temporal proximity to plaintiff's termination; the court disagrees. While it is true that plaintiff's filing of the First Charge in August 2001 and his discharge in July 2002 are nearly eleven months apart, during that period of time the First Charge was moving forward through the administrative process. Moreover, the EEOC issued a right to sue letter just a few weeks before defendant determined that it would terminate plaintiff. Although not an advisable legal strategy, it is possible that defendant terminated plaintiff in July 2002 as a result of receiving word that the EEOC had issued a right to sue letter. This undermines defendant's contention that there is a total absence of temporal proximity. If this were presented on a motion to dismiss, the court would conclude that at least a claim had been stated.

*11 Viewed under the summary judgment standard, however, taking into consideration the affidavits and depositions and drawing all reasonable inferences therefrom, the court finds the absence of any competent evidence to support a conclusion of retaliation. The overwhelming evidence before the court shows that defendant had legitimate non-discriminatory reasons for discharging plaintiff. Despite the generous latitude given to plaintiff in discovery, he has produced no evidence to suggest that defendant's motivations were anything other than that which it has stated. Consequently, the court finds that defendant is entitled to summary judgment on plaintiff's claims of retaliation.

## VI. CONCLUSION

For the reasons discussed above, the court will grant defendant's motion for summary judgment and deny plaintiff. An order shall issue.

## ORDER

At Wilmington this 28th day of July, 2004, consistent with the memorandum opinion issued this same day;

IT IS ORDERED that:

1. Plaintiff's motion for summary judgment is denied. (D.I.134)

2. Defendant's motion for summary judgment is granted. (D.I.129)

3. The Clerk of Court is directed to enter judgment in favor of defendant Super Fresh Food Markets, Inc. and against plaintiff Frances Pullella.

D.Del.,2004.
Pullella v. Super Fresh Food Markets, Inc.
Not Reported in F.Supp.2d, 2004 WL 1739716

Briefs and Other Related Documents (Back to top)

• 1:03CV00711 (Docket) (Jul. 14, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                    Page 1

Not Reported in F.Supp.2d, 2004 WL 234650
**(Cite as: Not Reported in F.Supp.2d)**

Not Reported in F.Supp.2d, 2004 WL 234650
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
William E. THORNBURG, Plaintiff,
v.
PAK 2000, INC., Defendant.
**No. Civ.A. 03-824 JJF.**

Feb. 2, 2004.

Michael P. Kelly , Anthony R. Winchester , Jennifer
M. Zelvin , of McCarter & English, LLP,
Wilmington, Delaware, for Plaintiff William E.
Thornburg.
William W. Bowser , Adria B. Martinelli of Young
Conaway Stargatt & Taylor, LLP, Wilmington,
Delaware, for Defendant PAK 2000, Inc.

*OPINION*

FARNAN, J.
**\*1** Presently before the Court is PAK 2000 Inc.'s ("
PAK") Motion to Dismiss And Motion To Compel
Arbitration. (D.I.7.) For the following reasons, the
Court will grant PAK's Motion.

BACKGROUND

This lawsuit arises from PAK's termination of
Plaintiff's employment as one of its security bag
account representatives in 2003. When PAK hired
Plaintiff the parties entered into an employment
contract (the "Employment Agreement") which
defined the rights and obligations of each party.
Included in the Employment Agreement is an
arbitration provision, compelling the parties to
submit claims arising from and related to the
Employment Agreement to arbitration. Following
his termination, Plaintiff filed the instant lawsuit
alleging breach of contract, breach of covenant, and

violation of the Age Discrimination and
Employment Act ("ADEA"). (D.I.1.) By its Motion
(D.I.7), PAK requests the Court to dismiss
Plaintiff's Complaint and compel arbitration.

I. Parties' Contentions

A. *PAK*

PAK contends that the Court does not have subject
matter jurisdiction over the instant lawsuit because
Plaintiff's employment contract requires the parties
to arbitrate all controversies "arising out of or
relating to" the Employment Agreement. PAK
contends that Plaintiff's contractual obligation to
arbitrate disputes prevails over Plaintiff's right to
pursue his ADEA claim in federal court.

B. *Plaintiff*

Plaintiff contends that the arbitration provision of
his Employment Agreement is invalid for several
reasons. Plaintiff contends that an individual may
not waive his or her right to a jury trial unless it is
done "knowingly and voluntarily." Plaintiff also
contends that an individual's right to a jury trial,
protected by state and federal law, prevails over the
federal policy favoring arbitration. Plaintiff further
contends that his ADEA claim does not arise out of
the Employment Agreement.

DISCUSSION

The Federal Arbitration Act (the "FAA") manifests
the " 'liberal federal policy favoring arbitration
agreements." ' *Gilmer v. Interstate/Johnson Lane
Corp.,* 500 U.S. 20, 25, 111 S.Ct. 1647, 1652 (1991)
. In relevant part, Section 2 of the FAA provides, "
[a] written provision in ... a contract evidencing a
transaction involving commerce to settle by

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2

Not Reported in F.Supp.2d, 2004 WL 234650
**(Cite as: Not Reported in F.Supp.2d)**

arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. When a party enters into a contract requiring arbitration, a party "[h]aving made the bargain to arbitrate, ... should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 627-28, 105 S.Ct. 3346, 3354-55 (1985). "Nothing short of a showing of fraud, duress, mistake" or some other compelling ground to invalidate a contract will permit a court to preclude the enforceability of an agreement to arbitrate. *Seus v. John Nuveen & Co., Inc.,* 146 F.3d 175, 184 (3d Cir.1998).

### I. The Knowing And Voluntary Waiver Of A Right To A Jury Trial Issue

**\*2** The Court is not persuaded by Plaintiff's contention that the arbitration provision at issue is unenforceable because Plaintiff did not knowingly and voluntarily waive his right to a trial by jury. As evidenced by Section 2 of the FAA, a contract to arbitrate has a presumption of validity. 9 U.S.C. § 2. Therefore, absent factors that would "exist at law or in equity for the revocation of any contract," *id.,* a court must enforce the parties' contractual agreement to arbitrate. In the instant case, Plaintiff has not asserted any facts demonstrating that his execution of the Employment Agreement was the result of fraud, duress, or mistake. *Sues,* 146 F.3d at 184. Further, the Third Circuit has previously rejected a "knowing and voluntary" waiver argument similar to Plaintiff's. In *Sues,* the Third Circuit held that applying a "knowing and voluntary" standard to employment contracts with arbitration provisions would be "inconsistent with the FAA and [Supreme Court precedent]." 146 F.3d at 184. FN1 Moreover, to the extent Plaintiff contends that his employment contract is unenforceable because it is a contract of adhesion, the Court need only note that "[u]nequal bargaining power is not alone enough to make an agreement to arbitrate a contract of adhesion." *Id.* For these reasons, the Court must recognize and defer to the arbitration provision in

the Employment Agreement.

> FN1. The Third Circuit in *Sues* also rejected an argument identical to Plaintiff's that the Older Workers Benefit Protection Act (the "OWBPA") requires a knowing and voluntary waiver of a party's right to trial by jury. The Third Circuit reasoned that the legislative history of the OWBPA does not indicate that Congress intended the heightened standard to apply to agreements to arbitrate. Instead, the Third Circuit concluded that the OWBPA's knowing and voluntary standard only applied to a party's agreement to waive his or her substantive rights under the ADEA. *Sues,* 146 F.3d at 181.

### II. The Effect Of Federal And State Constitutions Issue

Plaintiff's contention that the state and federal constitutions preclude a waiver of his right to a jury trial is not supported by applicable precedent. In *Mitsubishi,* the Supreme Court made clear that " [b]y agreeing to arbitrate ... a party ... submits to ... resolution in an arbitral, rather than a judicial, forum." 473 U.S. at 628. Plaintiff cites no case, nor has the Court found any, stating that an individual's right to a jury trial precludes enforcement of arbitration agreements. To the contrary, controlling precedent advises that " 'questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.' " *Id.* at 626 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24-25 (1983)). Therefore, the Court concludes that the right to a jury trial protected by the U.S. and Delaware Constitutions does not preclude the enforcement of the arbitration agreement in this case.

### III. The ADEA Claim Issues

The determination of whether Plaintiff's ADEA claim arises from or is related to his employment agreement is a matter of contract law. *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944, 115

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                   Page 3

Not Reported in F.Supp.2d, 2004 WL 234650
**(Cite as: Not Reported in F.Supp.2d)**

S.Ct. 1920, 1924 (1995). Therefore, a court must look to relevant state contract law principles. *Id.* However, the question of whether a particular claim is subject to arbitration "should be resolved in favor of arbitration." *Mitsubishi,* 473 U.S. at 626 (interior quotation omitted). This principle derives from the " congressional policy manifested in the Federal Arbitration Act ... requir[ing] courts [to] liberally ... construe the scope of arbitration agreements covered by that Act." *Mitsubishi,* 473 U.S. at 627.

**\*3** In the instant case, the arbitration agreement is governed by New Hampshire law. (D.I. 9, Ex. B at 6.) Under New Hampshire law, a contract to arbitrate has a presumption of arbitrability. *John A. Cookson Co. v. N.H. Ball Bearings, Inc.,* 787 A.2d 858, 355-56 (N.H.2001). Therefore, absent " ' positive assurance that the [contract] is not susceptible of an interpretation that covers the dispute," ' *id.* (quoting *Appeal of Town of Bedford,* 706 A.2d 680 (N.H.1998)), a court should conclude that a particular dispute is arbitrable. Applying these standards to the Employment Agreement, the Court concludes that Plaintiff's ADEA claim is subject to arbitration.

The Employment Agreement provides that "[a]ny controversy or claim arising out of or relating to this Agreement or the breach thereof shall be finally settled by arbitration in Mirror Lake, New Hampshire, in accordance with the then prevailing rules of the American Arbitration Association." (D.I. 9, Ex. B at 6.) In the Court's view, this broad arbitration clause evidences the parties' intent to arbitrate Plaintiff's ADEA claim. In his Complaint, Plaintiff alleges that PAK illegally discriminated against him and wrongfully caused him "injuries including, but not limited to, loss of pay, qualified commissions, loss of expense reimbursements, loss of severance, and loss of qualified bonuses (as further described in the ... employment contract)." (D.I.1.) The Court concludes that the injuries alleged by Plaintiff clearly are "related to" his Employment Agreement with PAK, and therefore, concludes that Plaintiff's ADEA claim is subject to arbitration.

Plaintiff's obligation to arbitrate the instant claims is not weakened because he alleges a potential statutory violation under the ADEA. *See Sues,* 146 F.3d at 180. Statutory claims are subject to arbitration agreements because a party "does not forgo the substantive rights afforded by [a] statute" by agreeing to arbitrate. *Id.* Plaintiff may pursue his ADEA cause of action in arbitration, and therefore, the " 'statute will continue to serve both its remedial and deterrent function." ' *Id.* (quoting *Mitsubishi,* 473 U.S. at 28).

### IV. Conclusion

The Court concludes that Plaintiff's ADEA claim is related to the Employment Agreement, and therefore, the Court will dismiss Plaintiff's Complaint because all of Plaintiff's claims are subject to arbitration.

An Order consistent with this Opinion will be entered.

### *ORDER*

At Wilmington this 2nd day of February 2004, for the reasons set forth in the Opinion issued this date;

IT IS HEREBY ORDERED that PAK 2000, Inc.'s Motion To Dismiss And Motion To Compel Arbitration (D.I.7) is *GRANTED.*

D.Del.,2004.
Thornburg v. PAK 2000, Inc.
Not Reported in F.Supp.2d, 2004 WL 234650

Briefs and Other Related Documents (Back to top)

• 1:03CV00824 (Docket) (Aug. 21, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I hereby certify that on June 23, 2005, I electronically filed the foregoing Opening Brief In Support Of Defendant's Motion To Dismiss with the Clerk of Court using CM/ECF which will send notification of such filing to the following and on June 23, 2005 mailed, via first class mail, postage prepaid, copies of the same to:

> Harvey P. Jamison, *pro se*
> 4 Nethy Drive
> Newark, Delaware  19711

*Kelly A Green*
_____
Kelly A. Green (#4095)
Green@rlf.com
Richards, Layton & Finger
One Rodney Square
P. O. Box 551
Wilmington, Delaware  19899
(302) 651-7700
Attorneys for Defendants